NATIONAL LABOR RELATIONS
BOARD, Petitioner,

and

Chauffeurs, Teamsters and Helpers Local
Union No. 391, Intervenor,

v.

PILOT FREIGHT CARRIERS,
INC., Respondent.

No. 76–1089.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 15, 1976.

Decided June 29, 1977.

Andrew F. Tranovich, Atty., N. L. R. B., Washington, D. C. (John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Paul J. Spielberg, Atty., N. L. R. B., Washington, D. C., on brief), for petitioner.

Robert M. Baptiste, Washington, D. C. (Gary S. Witlen, and Angelo V. Arcadipane, Washington, D. C., on brief), for intervenor.

John O. Pollard, Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., on brief), for respondent.

Before HAYNSWORTH, Chief Judge, and WINTER and BUTZNER, Circuit Judges.

HAYNSWORTH, Chief Judge:

This is a petition for enforcement of the National Labor Relations Board's order against Pilot Freight Carriers, Inc. The Board found that Pilot's dispatchers at its Kernersville, N. C. terminal were "employees" and not "supervisors" within the meaning of §§ 2(3) and 2(11) of the National Labor Relations Act, 29 U.S.C.A. §§ 152(3), 152(11) (1973)[1] and that Pilot had violated

---

1. Section 2(3) excludes "any individual employed as a supervisor" from the definition of "employee".
   Section 2(11) defines "supervisor" as follows: "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effective-

Section 8(a) (1), (3) and (5) of the Act, 29 U.S.C. §§ 158(a)(1), (3) and (5) (1973) by coercively interrogating its employees, by issuing job descriptions, and instituting a supervisory training program intended to deprive its dispatchers of their "employee" status and by failing to consult the Union before issuing the job descriptions and instituting the training program. In response to the Board's petition Pilot contends that it was free to question the dispatchers, issue the job descriptions, and institute the training program because the dispatchers were "supervisors" and thus not protected by § 8(a)(1) and (5).

## I.

■■■■ We need not evaluate every function performed by each type of dispatcher in order to determine whether the Board's determination that they were not supervisors within the meaning of § 2(11) is supported by substantial evidence. It is well settled that "§ 2(11) is to be read in the disjunctive with the existence of any one of the statutory powers, regardless of the frequency of its exercise, being sufficient to confer supervisory status upon the employee." *Pacific Intermountain Express Co. v. NLRB*, 412 F.2d 1, 3 (10th Cir. 1969); *accord NLRB v. Metropolitan Petroleum Co.*, 506 F.2d 616, (1st Cir. 1974) as long as the existence of the power is real rather than theoretical. *NLRB v. Southern Bleachery and Print Works*, 257 F.2d 235, 239 (4th Cir. 1958). But the statute also makes it clear that the exercise of those powers must require the use of independent judgment and not be merely routine or clerical. A mere lead man or a straw boss is not a "supervisor" under the Act. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 279, 283, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974).

As the Board points out, the legislative history of § 2(11) clarifies the meaning of the independent judgment requirement. Section 2(11) was added by the Taft-Hartley Act. In enacting that section, Congress was concerned about the effect of unrestricted unionization of first-line supervisors. Congress believed that fraternal union feelings would tend to impair a supervisor's ability to apply his employer's policy to subordinates according to the employer's best interests. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *Beasley v. Food Fair of North Carolina*, 416 U.S. 653, 660, 94 S.Ct. 2023, 40 L.Ed.2d 443 (1974). It withdrew certain protections from "supervisory" employees in order to give employers more freedom to prevent a pro-union bias from interfering with the independent judgment of employees holding supervisory positions.

Pilot's dispatchers must be classified as supervisors if they actually possessed at least one of the "supervisory" powers listed in § 2(11) and the exercise of that power required "independent judgment." They possessed "independent judgment" if there was a substantial possibility that fraternal feelings arising from the unionization of the dispatchers would interfere with the proper exercise of the dispatchers' power.

The evidence in this case was presented to an administrative law judge. The hearing lasted thirteen days and produced a two-thousand page transcript. After hearing the testimony and receiving documentary evidence, the administrative law judge found that Pilot's dispatchers were supervisors and that Pilot had not violated the Act by questioning them, instituting the supervisory training program, and issuing job descriptions outlining their supervisory authority. But the Board rejected the administrative law judge's determination. It found that Pilot's dispatchers were employees rather than supervisors.

■■■■ We must accept the Board's finding if it is supported by substantial evidence on the whole record, *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951) even if we might have resolved the question differently. *Bayside Enterprises v. NLRB*, 429 U.S. 298, 97 S.Ct. 576, 50 L.Ed.2d 494 (1977). Deference to the Board's finding is especially appropriate here because the case involves

ly to recommend such action, if in connection with the foregoing the exercise of such authori-· ty is not of a merely routine or clerical nature, but requires the use of independent judgment."

but one specific instance of the "[m]yriad forms of service relationship, with infinite and subtle variations in the terms of employment, [which] blanket the nation's economy," and which the Board must confront on a daily basis.

*Id.* at 303, 97 S.Ct. at 581.

But neither the General Counsel nor the Board have directed us to substantial evidence supporting the Board's decision. We have examined the lengthy transcript as well as the material submitted in the joint appendix and find no substantial evidence to rebut the testimony that indicates that the dispatchers involved here possessed supervisory authority requiring the use of independent judgment as defined by § 2(11).

## II.

Pilot is an interstate trucking company with terminals throughout the eastern seaboard. The central terminal is in Kernersville, North Carolina. During the period involved here[2] there were three types of dispatchers at the Kernersville terminal: local dispatchers, line-haul dispatchers and central dispatchers.

(a) Local dispatch was separate from the integrated central and line-haul dispatch operations. Pilot employed two local dispatchers who directed the movement of freight delivered or picked up within a fifty-mile radius of Kernersville. They worked five days a week between 6 a. m. and 7 or 8 p. m. Pilot's terminal manager supervised the local dispatchers.

When a load was ready for local delivery, the local dispatcher assigned the load to a local driver, printed the departure time on the driver's trip card, and gave the driver the trip card and other documents before sending him on his way. During the day the local dispatchers received requests from customers and salesmen to pick up freight within the local area. They recorded each request and instructed drivers by telephone or radio to make the pickup. When the

drivers completed their work and returned to the terminal, the local dispatchers received various documents from the drivers.

The forty-eight local drivers were paid by the hour. A union contract governed the assignment of the drivers to loads ready for delivery. The "regular bid" drivers were the most senior drivers. They bid by seniority for priority in the right to carry loads destined for certain areas. "Wild bid" drivers bid for priority in the right to carry loads departing at certain hours. The "wild bid" drivers could replace "regular bid" drivers who were unavailable, or they could serve a regular-bid driver's run when the freight to be delivered on that run exceeded the regular-bid drivers' capacity. "Unassigned drivers" and "preferential casual" drivers worked when none of the "regular bid" or "wild bid" drivers were available. Assignments from these four groups were made according to seniority lists. When no drivers from those groups were available, the local dispatchers resorted to a list of "casual casual" drivers who had been approved by the company personnel, safety, and security departments. When a "casual casual" driver was needed, the local dispatcher had discretion to choose the "casual casual" driver he thought could best perform the task.

The local dispatchers had discretion to give pickup assignments to the local driver whom they thought could best perform the task.

In support of the finding that the local dispatchers were not supervisors during the period under consideration, the Board stated that the assignment of drivers to loads was thoroughly routinized, that economic consideration governed the local dispatchers' decisions, and that the terminal manager was the true supervisor of the local drivers. But the record does not support the Board's findings.

2. The dispute here involves the nature of the dispatchers' duties during the period from August 1973 through February 1974 for that is when the acts giving rise to this dispute occurred. Thus, we will discuss the dispatchers' duties as they were at that time and not as they were at the time of the hearing on the charges.

Although a union contract automatically determined the assignment of drivers in most instances, the local dispatcher possessed and exercised discretion in the assignment of drivers. Local dispatcher, P. O. Church, a witness for the General Counsel, testified that, on occasion, he had sent drivers into areas and assigned starting times for which they had not bid when he determined that such assignments were necessary to move freight. (Tr. 199–200). In opposition to Church's testimony, the Board referred us to local dispatcher Merritt's general description of how he assigned drivers. Testifying for the company, Merritt said "It is basically the same thing every day . . . it is just the bids well, the only time it would change . . . is when you use the wild men." (Tr. 1133). But Merritt did not really contradict Church for it is clear that Merritt spoke only in general terms.

█ Merritt later stated that he might require a driver to go outside of "his area" to make a pick-up. (Tr. 1138).[3] Church also stated that he had discretion in assigning drivers to pick-up freight. (Tr. 137). Although Church indicated that a driver's equipment affected his decision, it seems clear that where several drivers had the equipment and space necessary to make a pick-up, the local dispatcher had discretion to select the driver for the task.

It is also clear that local dispatchers had discretion to choose which of the approved casual casual drivers would actually be given assignments. (Tr. 215–17). Church said that he selected them according to availability and location. (Tr. 151). Merritt corroborated Church and further noted that his evaluation of a driver entered into his selection. (Tr. 1152–53).

█ The Board contends that the local dispatcher's discretion in choosing casual casual drivers for assignment is not relevant because the company was not using

casual casual drivers at the time of the hearing. Pilot responds that it was not using casual casual drivers at the time of the hearing because its business had not yet recovered from the effects of a strike that occurred several months after this dispute arose. There is no evidence indicating that at the time involved here, the local dispatcher's authority to assign casual casual drivers was only theoretical. Although the dispatcher may not have exercised that authority at the time of the hearing, they did exercise it at the time this dispute arose. In any event it is "not the exercise of authority, but the delegation of authority which is indicative of the attributes of a supervisor." *NLRB v. Southern Seating Co.*, 468 F.2d 1345, 1347 (4 Cir. 1972).

The local dispatcher's decision regarding the amount of work assigned to a driver for the day directly affected a driver because it could determine whether and how much overtime was allocated to that driver. Both Church and Merritt agreed on this point. (Tr. 156–57, 1146). The Board does not point out any evidence to the contrary.

Although economic considerations clearly affected the local dispatcher's decisions, the record does not show that economic factors prevented the dispatcher from assigning drivers according to their individual capabilities. Indeed, a driver's ability was a factor involved in the decision as to whether he would be assigned outside his area and how many pick-up assignments would be given him.

Nor does the record support the Board's finding that the terminal manager rather than the local dispatcher supervised the local drivers. Miller, terminal manager at Kernersville at the time this dispute arose, testified that he supervised a variety of operations at the terminal through various first-line supervisors. Miller said that he was responsible for the office clerks and the warehouse clerks both of whom were direct-

---

3. Even if Merritt's testimony is interpreted as contradicting Church's testimony, the administrative law judge's resolution of the credibility of conflicting testimony is entitled to great weight. Here the administrative law judge apparently believed Church for he found that the local dispatchers did have the authority to depart from the bid system in assigning drivers when they determined that the situation required it. (App. 57).

ed by a Ms. Beacham, for the rate billing department which was headed by a Mr. Hamer, and for the local dispatchers and local drivers. He specifically said that he did not supervise the local drivers directly but through the local dispatchers. (Tr. 1795). It is difficult to believe, as the Board contends, that Miller served as the first-line supervisor of the 48 local drivers in addition to his other duties.

The Board does not point to any substantial evidence indicating that the terminal manager was the true first-line supervisor of the local drivers.[4] The Board refused to accept the testimony that local dispatchers had the authority to grant time off to drivers (Tr. 1135–40) and to determine initially whether a driver was too drunk to make a run because neither Church nor Merritt could remember a specific incident where they had granted time off or had determined that a driver was intoxicated and refused to let him accept an assignment. But, as noted above, it is the delegation rather than the exercise of authority which is significant. *NLRB v. Southern Seating Co.*, 468 F.2d 1345, 1374 (4 Cir. 1972). The Board points to no evidence showing that the local dispatchers lacked such authority or that those decisions were the terminal manager's alone. Nor does the Board refer us to any evidence indicating that the terminal manager ever saw or spoke to the local drivers on a regular basis.

■ The Board has not shown that there is substantial evidence to contradict the evidence that the local dispatchers had the authority to assign local drivers to different areas and different times than those for which they had bid, decide the amount of pick-up work given to a driver, select casual casual drivers, and generally act as the first-line supervisor of the local drivers. It is clear that the local dispatchers had the authority "responsibly to direct" the local drivers. There is a substantial possibility that the fraternal feelings engendered by union membership would threaten the ability of a local dispatcher with such responsibilities to exercise his authority in his company's best interest. Therefore we find that the Board's determination that the local dispatchers were employees rather than supervisors was not supported by substantial evidence.

(b) Line-haul dispatchers were responsible for dispatching drivers and freight to terminals and customers beyond a 50-mile radius from Kernersville. The line-haul dispatch operation never closed. One line-haul dispatcher and one dispatch clerk was on duty at all times.[5]

A union contract required that "over-the-road" drivers be assigned to loads on a first-in, first-out basis. The company had to pay a penalty when it departed from the method of assignment set forth in the union contract. Line-haul dispatchers were supervised by a supervisor of road dispatch.

The Board reversed the administrative law judge's finding that the line-haul dispatchers were supervisors because it found that the line-haul dispatchers' primary concern was to move equipment quickly and economically, that the line-haul dispatchers' decisions regarding drivers were governed by explicit company policies and union contract provisions, and that driver supervisors, who were on duty 24 hours a day, actually supervised the over-the-road drivers. But the record does not support the Board's position.

4. Although Merritt answered "yes" when asked if the terminal manager was the immediate supervisor of all the drivers as well as the local dispatchers, we have no way of knowing what Merritt understood the term "immediate supervisor" to mean. In view of Merritt's assertion that he had the authority to discipline drivers (Tr. 1141), grant time off (Tr. 1138–40) and vary assignments from that set by the bid system, his apparent admission that the terminal manager was the immediate supervisor of the local drivers is not substantial evidence that the terminal manager was in fact the first-line supervisor.

5. Dispatch clerks were originally part of this dispute, but the parties stipulated that dispatch clerks were "employees" because, unlike the dispatchers, the clerks received hourly wages, punched a time clock, and did not participate in the company bonus plan.

Although the assignment of drivers was often a routine process governed by the union contract, there was testimony that the line-haul dispatchers sometimes had discretion in applying the first-in, first-out system and that the company permitted the dispatchers to depart from the contract assignment system and use their own discretion in assigning drivers under certain circumstances. The Board does not show any substantial evidence contradicting that testimony.

The General Counsel's own witness, line-haul dispatcher, Grady Kiser, testified that even under the union contract, he had discretion to select drivers when two loads of a similar category were to depart simultaneously and when many loads departed in a short period of time. Kiser also admitted that he did select particular drivers for certain loads. (Tr. 513–14).

Lonnie Booe, the supervisor of the line-haul dispatchers, testified that the line-haul dispatchers often intentionally departed from the assignment order mandated by the union contract and "ran around" one driver for another. He indicated that the benefit of the superior service or availability of some drivers was worth the penalty for violating the contract.

The Board does not show any evidence contradicting Kiser's statement. But it does attempt to show that line-haul dispatchers had no discretion to deliberately violate the union contract and "run around" a driver. The Board points to Driver Supervisor Wade Seal's testimony that a dispatcher was not doing his job right when he deliberately ran around a driver (Tr. 1414(2)) and the portion of Booe's testimony where Booe obviously wished to avoid stating that the company had a policy of permitting deliberate run-arounds. (Tr. 1344). The evidence, however, clearly shows that the company condoned, and perhaps encouraged, run-arounds where the dispatchers felt that the benefits outweighed the penalty under the contract. Seal did not assert that company policy prohibited run-arounds. He admitted that the practice continued even though he had complained

to the dispatchers and the dispatchers' supervisor and that no one had been fired for making deliberate run arounds. (Tr. 1414(2)–(4)). Although reluctant to state that there was a policy permitting deliberate run-arounds, Booe clearly stated that the company condoned them (Tr. 1345) and defended the practice as the only way to get the loads moved under some circumstances. (Tr. 1302–04, 1344–45).

As additional support for our finding here, we note that the Regional Director of Region 12 has found that Pilot's line-haul dispatchers in Florida have "authority to deviate from the contract terms if they decide that a driver is not qualified or it would be faster and more efficient to dispatch on another basis." *Pilot Freight Carriers, Inc. and Truck Drivers, Warehousemen and Helpers Local Union 512,* No. 12–RC–5204 (November 22, 1976). The Board has refused to review the Director's decision. The Regional Director noted that Pilot's Florida terminal was different from the Kernersville terminal because driver supervisors were on duty at all times at Kernersville and not in Florida. But the Board has not directed us to any evidence that the driver supervisors at Kernersville had anything to do with the dispatchers' authority to depart from the contractual assignment procedure and incur penalties when they found it expedient to do so.

There was also substantial testimony that the line-haul dispatchers had discretion to decide whether a driver who arrived late should be permitted to take his load or should be sent to the driver supervisor. Grady Kiser, a line-haul dispatcher testifying for the General Counsel, testified that when a driver arrived 30 or 45 minutes late, the dispatcher had to decide whether the driver had been so unreasonably late that he should be sent to the driver supervisor. Kiser also said that the dispatcher was the only one who determined initially whether a driver had been unreasonably late (Tr. 525–27) and that he, Kiser, had permitted drivers to report late and switch loads with another driver in order to avoid missing a load. (Tr. 527–28).

The Board argues that the dispatcher exercised no independent judgment in handling drivers who reported late. It asserts that the dispatcher routinely permitted a 30-minute grace period for some priority loads and that the dispatcher was required to send a driver to the supervisor if the driver were more than a half hour late. (NLRB brief p. 23 n. 33). But it is clear that the Board has misconstrued Kiser's testimony. The portions of the transcript upon which the Board relies show that there was no firm requirement regarding a 30-minute grace period. Although Kiser insisted that the driver supervisor rather than the dispatchers decided how to discipline a late driver, Kiser made it very clear that only the dispatchers had the discretion to determine whether drivers would be referred to the supervisor and that there was no penalty for reporting late unless the dispatcher forced a driver to see the supervisor. (Tr. 408–10, 527–28). Thus there is no substantial evidence supporting the Board's finding that the line-haul dispatcher had no discretion in handling late drivers.

Finally there was substantial testimony that the line-haul dispatcher had the responsibility to determine whether a driver was intoxicated and should be sent to the driver supervisor on charges of reporting for work in an intoxicated condition. (Tr. 411, 1297). The Board contends that there is no supervisory responsibility involved in reporting drunk drivers because company policy and government regulations prohibit the company from allowing an intoxicated driver to depart. But the record clearly shows that the company relied on the dispatcher to detect and report intoxicated drivers. The dispatcher had to decide whether a driver's condition required that he be sent to the supervisor. Although the dispatcher merely forces a driver to go to the supervisor,[6] that in itself is a form of discipline.

When this dispute arose, the company depended upon the line-haul dispatchers to prevent inebriated drivers from going out on the road, to ensure that drivers were not allowed to be unreasonably late in reporting for duty, and to "run around" a driver or permit a driver to switch loads if necessary to meet the company's obligation to deliver freight on time.

■ It is clear that the line-haul dispatchers possessed the authority "responsibly to direct" the drivers as well as some of the other supervisory authorities listed in § 2(11). Undivided loyalty from its line-haul dispatchers in the exercise of their discretion was essential to the company. The record does not support the Board's finding that these dispatchers were "employees" rather than supervisors.

(c) Central dispatchers were responsible for moving freight in a manner which would maximize profits. Two were on duty at all times. They were supervised by a director of central dispatch.

---

6. The Senate implicitly rejected an argument similar to that made by the Board regarding the driver supervisors being the only true supervisors of these drivers when it added the words "or responsibly direct them" to the definition of employer in § 2(11). In proposing the amendment Senator Flanders said

Many of the activities described in paragraph (11) are transferred in modern practice to a personnel manager or department.

In fact, under some modern management methods, the supervisor might be deprived of authority for most of the functions enumerated and still have a large responsibility for the exercise of personal judgment based on personal experience, training, and ability. He is charged with the responsible direction of his department and the men under him. He determines under general orders what job shall be undertaken next and who shall do it. He gives instructions for its proper performance. If needed, he gives training in the performance of unfamiliar tasks to the worker to whom they are assigned.

Such men are above, the grade of "straw bosses, lead men, set-up men, and other minor supervisory employees". . . . Their essential managerial duties are best defined by the words, "direct responsibly," which I am suggesting.

In a large measure, the success or failure of a manufacturing business depends on the judgment and initiative of these men. 2 *Legislative History of the Labor Management Relations Act of 1947* 1303 (1947)

The central dispatchers assigned departure times to most loads leaving Kernersville and also to loads leaving other terminals· when they were closed at night or on weekends. They communicated with all of Pilot's terminals by teletype and telephone. One of their major functions was to keep track of each trailer and to monitor the conditions at each of Pilot's forty-one terminals at all times. Another function of the central dispatchers was to receive all communications from drivers once they were on the road.

The Board rejected the administrative law judge's conclusion that the central dispatchers were "supervisors" because it found that the central dispatchers merely exerted direction and control over the movement of equipment and that their direction of personnel was only an incidental part of their direction of equipment. The Board's opinion admits that central dispatchers decided which load was the first to leave a terminal that had been closed for the night, whether to overrun a terminal by sending in more drivers than were needed to carry away the outgoing freight, and other things that admittedly could increase or decrease a driver's pay. Yet it states that those decisions involved the weighing of economic factors rather than any real employee supervision. Furthermore, the Board found that well-defined company policies deprived the central dispatchers of any real discretion in the instructions which they gave to drivers and that the driver supervisors were the true supervisors of the over-the-road drivers.

But the record indicates that the Board failed to recognize the supervisory function performed by the central dispatchers in deciding whether to permit drivers to stop driving early or vary his route for personal reasons. There is substantial testimony that the central dispatcher had discretion to grant or deny a driver's request to stop driving early or detour from his route for personal reasons. (Tr. 834–37, 839–41, 935–37, 1739–40).

The Board contends that the company had a specific policy of permitting drivers to stop early if the company lost no more than one hour of driving time and the driver saved the company the cost of a motel room by staying with relatives. (NLRB brief at 30). But the Board misconstrues the testimony upon which it relies. The testimony cited in the Board's brief shows that central dispatchers considered several factors including their personal evaluation of a driver in handling such a request. It does not show any clear company policy which deprived the central dispatchers of discretion.

The Board also argues that the driver supervisors have preempted any supervisory authority that the central dispatchers may have had regarding request for time off or route variation. (NLRB reply brief, p. 6). But again the Board misconstrues the testimony upon which it relies. The testimony cited by the Board does not show that driver supervisors alone controlled the decision to grant time off for personal reasons once the supervisors began to be on duty 24 hours a day. It shows that the central dispatchers were familiar with some drivers, handled some requests for time off without consulting a driver supervisor, and played a major part in the decision to grant time off for personal reasons even when a supervisor was consulted. (Tr. 957, 1394–96). Although it seems that the central dispatchers may have abused their authority by letting too many drivers have time off to visit the dog tracks in Florida and that the company had to give the driver supervisors more control over time-off requests from drivers in that area, the Board has not pointed to any testimony stating that the driver supervisors alone decided whether to grant requests for time off or route variances for personal reasons.[7]

■ The portions of the record noted in the Board's briefs indicate that the company relied upon the central dispatchers to determine when requests for time off could be granted and that the dispatchers were aware of the effect of their decision upon

7.  See note 6 on page 212 *supra*.

the driver. It is clear that there was a substantial possibility that a fraternal union relationship between central dispatchers and drivers could have impaired the dispatchers' ability to make their decisions in the company's best interests. Thus, we find that the Board's conclusion that the central dispatchers were "employees" rather than "supervisors" is not supported by substantial evidence.

■ Our finding that the Board erred in classifying the dispatchers as "employees" rather than "supervisors"[8] disposes of the 8(a)(1), (3) and (5) charges regarding the dispatchers. Since the dispatchers were already supervisors when the company issued the job descriptions and initiated the training program, the company did not violate the Act by altering the dispatchers' duties without consulting the union and cannot be accused of attempting to deprive the dispatchers of their rights by unilaterally changing the dispatchers into "supervisors." In view of the supervisory status of the dispatchers, the company was also free to talk with them about their union activities.

■ Although the company's director of central dispatch took dispatch clerk Oscar Hill into his office and spoke with him concerning the union, that conversation is the only one that could be violative of the Act. In view of the absence of any other violation on the part of the company, the conversation with Hill becomes an isolated incident which does not require the entry of a formal cease and desist order even though Hill was an "employee" and was protected by the Act from coercive interrogation regarding his union activities.

Therefore we decline to enforce the Board's order.

*ENFORCEMENT DENIED.*

---

**8.** We note that our decision here is in accord with the decisions of other circuits rejecting, although in different factual contexts, the Board's attempts to treat dispatchers as "employees" under the National Labor Relations Act. *See NLRB v. Metropolitan Petroleum Co.,* 506 F.2d 616 (1st Cir. 1974); *NLRB v. Gray Line Tours, Inc.,* 461 F.2d 763, 764 (9th Cir. 1972); *Pacific Intermountain Express Co. v. NLRB,* 412 F.2d 1, 2–4 (10th Cir. 1969); *Eastern Greyhound Lines v. NLRB,* 337 F.2d 84 (6th Cir. 1964).