592 F.2d 5
 100 L.R.R.M. (BNA) 2764, 85 Lab.Cas. P 11,107
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
J. K. ELECTRONICS, INC., d/b/a Wesco Electrical Company, Respondent,
United Electrical, Radio and Machine Workers of America,
(UE), Intervenor.
 No. 78-1267.
 United States Court of Appeals,
First Circuit.
 Argued Dec. 5, 1978.
Decided Feb. 16, 1979.
 
 Norman Moscowitz, Atty., Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Janet C. McCaa, Atty., Washington, D. C., were on brief, for petitioner.
 Brian E. Hayes, with whom Skoler & Abbott, P.C., Springfield, Mass., was on brief for respondent.
 Robert Z. Lewis, Sarah R. Wunsch, and Leonard D. Polletta, New York City, on brief, for intervenor.
 Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.
 LEVIN H. CAMPBELL, Circuit Judge.
 
 
 1
 The employer, J. K. Electronics, Inc., contests the determination of the National Labor Relations Board that the group leaders in its plant are supervisors within the meaning of 29 U.S.C. § 152(11).[1]
 
 
 2
 The Board's ruling rested on its finding that the group leaders have the power to effectively recommend disciplinary action in the areas of rule infractions and low production.[2] Group leaders, according to their job description, are responsible for coordinating production activities within their assigned sphere. Pursuant thereto, they are to "report any problems impeding (their) ability to carry out (their) function to the Shift Supervisor." Specifically, they have the responsibility to "(m)ake recommendations on all new personnel to the Shift Supervisor," to "(r)eview individual production tabulations on a daily basis and report substandard totals to Shift Supervisors," to "(r)eport all personnel and production problems" and "insubordination incidents" to the shift supervisor. As, according to the Board, the group leaders make recommendations in the discharge of these duties that result in verbal and written warnings to employees, they have the power effectively to recommend disciplinary action. This determination was at odds with that reached by the ALJ who characterized the duties set forth in the job description as being those of a "leadman with little or no authority and with minimal discretion." Noting without further elaboration that "there appeared to be independent supervisory investigations made" of the group leaders' reports concerning employees, the ALJ concluded the group leaders' recommendations were not sufficiently effective to render them supervisors within the meaning of 29 U.S.C. § 152(11).
 
 
 3
 The Board, while explicitly deferring to the ALJ's resolutions of credibility, observed that independent supervisory investigations were not always conducted. In fact, in many of the disciplinary instances testified to, it is not clear from the record to what extent, if any, supervisors actually independently investigated the matters in question, though in some cases it is clear from the nature of the event that opportunity for independent assessment was severely limited and deference of necessity had to have been accorded to the group leaders' reports. This is true of an incident of an employee's swearing at a group leader. The swearing was not witnessed, the employee quit on the spot, and the supervisor adopted the group leader's report of the event in the supervisor's recommendation that the employee not be rehired. Similarly, in those instances of repeated infractions of safety rules and of excessive talking during production time which resulted in written warnings, it is reasonable to infer that reliance was placed on the group leaders' daily observations of the offending employees. The text of the warnings supports this inference.
 
 
 4
 We agree with the Board that what is involved in this case is not contrary resolutions by the Board and ALJ of conflicting factual predicates. Rather, the Board has drawn from essentially the same factual premises as the ALJ different inferences concerning the effectiveness of the group leaders' recommendations. In these circumstances, for the purpose of our review, the significance of the disagreement between the Board and the ALJ is diminished, and "the Board's special understanding is at least as important an aid in interpreting the facts as is the ALJ's immersion in the case." NLRB v. Matouk Industries, Inc., 582 F.2d 125, 128 (1st Cir. 1978).
 
 
 5
 Determining the effectiveness of the group leaders' recommendations on disciplinary matters is basically a factual, not a legal matter. Stop & Shop Companies, Inc. v. NLRB, 548 F.2d 17, 19 (1st Cir. 1977). Even if reasonable minds could also go the other way, we must uphold the Board if its ultimate finding is supported by substantial evidence on the record as a whole. Universal Camera v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed.2d 456 (1951). This court has said, moreover, that an evaluation of the subtle gradations of authority involved in determining whether an employee is, as a practical matter, within the statutory definition of supervisor rests in large measure with the informed discretion of the Board. NLRB v. Swift and Co., 292 F.2d 561, 563 (1st Cir. 1961).
 
 
 6
 Both the group leaders' job description and evidence of the procedure followed in a number of disciplinary incidents support the conclusion that group leaders have a sufficiently substantial and effective input in the disciplinary process to render them supervisors within the meaning of the Act. Group leaders are responsible for satisfying production goals and they may loose their position, as happened to one group leader, if they are unable to get the employees in their group to meet their quota. Thus, it is in their interest to enforce work standards. The record indicates that supervisors actively solicit the group leaders' opinions on the behavior, attitude, and productivity of employees and almost always act in accordance with the views expressed. Reports made by group leaders of improper employee attitude, argumentativeness, failure to meet quotas, behavior interfering with production such as excessive talking have been followed by supervisors' issuances of written warnings to the employees. In some instances, the group leader, in addition to the supervisor, signs and delivers the warning. In only one of the numerous incidents testified to was a group leader's recommendation not completely followed by her supervisor. During a slack production period in which layoffs were contemplated, the group leader had asked that a specific employee remain in her department; instead, the employee was transferred to another department but was not laid off.
 
 
 7
 Considering the record as a whole, the Board's determination of the group leaders' status is within the permissible range of its discretion.
 
 
 8
 Nor, as the employer contends, is the Board's decision necessarily contrary to its decision in Ball Plastics Division, 228 NLRB No. 7 (1977).[3] The dispositive difference is the finding in Ball Plastics that supervisors normally conducted their own independent investigations of disciplinary matters reported by group leaders. Here, the ALJ did not make such an unequivocal finding; rather, he merely noted without any reference to specific supporting evidence or to the frequency of the occurrence, that independent investigations appeared to be made. In this case, the existence, frequency, and importance of supervisory investigations were largely a matter of inference from the record, and we cannot say that the Board's conclusions were unsupported on the record as a whole.
 
 
 9
 The petition for enforcement is granted.
 
 
 
 [1]
 Procedurally this case reaches us as follows: The employer and union entered into a stipulation for Certification Upon Consent Election. Pursuant to this stipulation which provided for inclusion into the bargaining unit of the employees now challenged, the group leaders, an election was held. Of the 115 ballots cast, 56 were for the union, 47 were against and 12 those of the 11 group leaders plus one other immaterial to the issues presented on this appeal were challenged. After a hearing, the ALJ concluded the group leaders were not supervisors within the meaning of 29 U.S.C. § 152(11) and recommended the challenges be overruled. The NLRB reversed and certified the union as the bargaining representative in a unit excluding the group leaders. Thereafter the employer refused to bargain with the union, and the union filed an unfair labor practice charge. The Board ordered the employer to cease and desist from refusing to bargain with the union and now seeks to enforce this order
 
 
 [2]
 Supervisor is defined in 29 U.S.C. § 152(11) as "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." This section is in the disjunctive, thus, employees possessed of any one of the enumerated authorities are generally considered to be supervisors within the meaning of the Act. NLRB v. Magnesium Casting Co., 427 F.2d 114, 117 (1st Cir. 1970), Aff'd, 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735, Reh. denied, 402 U.S. 925, 91 S.Ct. 1364, 28 L.Ed.2d 664
 
 
 [3]
 The employer also refers to Air Filter Corporation, 231 NLRB No. 120 (1977) which is inapposite. The disciplinary activities of the leadman therein were far less substantial than those of the present group leaders