NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

ST. MARY'S HOME, INC., t/a St. Mary's
Infant Home, Respondent (two cases).

Nos. 81–2178, 81–1994.

United States Court of Appeals,
Fourth Circuit.

Argued May 5, 1982.

Decided Sept. 17, 1982.

Charles P. Donnelly, Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on brief) for petitioner.

Daniel R. Weckstein, John M. Ryan, Norfolk, Va. (Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for respondent.

Before RUSSELL, WIDENER and MURNAGHAN, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The National Labor Relations Board (Board) has petitioned for enforcement of two of its orders finding a number of violations by the respondent St. Mary's Home, Inc. (Home) of Sections 8(a)(1), 8(a)(3) and 8(a)(5) of the National Labor Relations Act. Home has entered objections to enforcement. We enforce in part and deny enforcement in part.

The respondent Home is a non-profit, charitable health care institution, with sixty beds, providing care and treatment of severely disabled and handicapped children up to nine years of age. Located in Norfolk, Virginia, it is a Catholic institution, under the general supervision of the Bishop of the Roman Catholic Diocese of Richmond, with actual day-to-day management vested in an Administrator, Jolly, a licensed hospital administrator. It employs four registered nurses (RNs), one of whom is the director of nursing, and the other three being supervisors, in whole or in part, of the three shifts later described, three licensed practical nurses (LPNs), numerous nurses' aides and housekeeping and service employees. The nursing employees are divided into three shifts operating on a five-day week. The first shift is from 7 A.M. to 3 P.M., the second from 3 P.M. to 11 P.M. and the third from 11 P.M. to 7 A.M. One RN and one LPN assisted by a number of nurses' aides

and other auxiliary employees, constitute the normal work complement for each shift, though this distribution of nurses is not uniformly followed on the third shift. Only the RNs and LPNs are authorized to administer medication to the children; nurses' aides are expected to clothe and bathe the children and otherwise attend to their needs. The other employees perform various housekeeping services.

The third shift (from 11 P.M. to 7 A.M.), with which the discriminatory discharge herein was concerned, consisted most of the time of one RN and one LPN, along with a number of nurses' aides and other personnel. Georgia Patillo was the RN assigned to the shift and Sheila Mitchell was the assigned LPN, at all times relevant to this proceeding. The RN was on duty three and off duty two of the five-day-work-week. When on duty she was in charge of the shift. The LPN replaced the RN in charge of the shift on the two days the latter was off duty. During the times when either the RN Patillo or the LPN was in charge of the third shift, no other responsible supervisor was on duty or present on the premises.

In early 1979, an effort was begun to organize the workers at the Home. Mitchell was described by the administrative law judge as "[t]he instigator of union activity at the Home." This activity of Mitchell came to the attention of Jolly, the Home's administrator. Jolly called Mitchell in, told her, as he had earlier told her and all other LPNs some months earlier, that she was a supervisor, and that because she was a supervisor, she was barred from soliciting on behalf of the Union. Mitchell disregarded this warning; and, as the administrative law judge found, she was "unrelenting" in her union activity. A day or two later, Mitchell advised Jolly by letter that she did not regard herself as a supervisor and that the position of Jolly that she was a supervisor was "self-serving". A few days later Jolly again counseled Mitchell that she was a supervisor and was warned again that if she did not "change her attitude and insub-

ordinate demeanor she would be terminated without further warning." It was later reported to Jolly that Mitchell had threatened other employees in an effort to induce them to sign union representation authorization cards. Jolly discharged Mitchell on January 30, 1980, both for insubordination, for violation of her responsibilities as a supervisor, and for threatening a fellow employee "with bodily harm."

In the meantime, the Union[1] had filed two certification petitions. One included the LPNs, the other excluded them from the proposed unit. Before a hearing was had on these petitions, the petition which provided for the inclusion of LPNs in the bargaining unit was withdrawn. The petition omitting all supervisory personnel, including LPNs, resulted in a Decision and Direction of an election. Home filed objections to the Decision but the objections were dismissed and an election was held on April 2, 1980.

The results of the certification election were 46 votes for the Union and 39 votes against, with 4 challenges. Home filed objections to the election. Without a hearing, the Regional Director of the Board dismissed the objections and certified the Union as the bargaining agent for the proposed unit. Upon Home's refusal to bargain with the Union following the certification, a charge was filed by the Board against Home. In the meantime, the Board had filed charges involving a variety of other violations, including coercive conduct to discourage union activity, as well as the illegal discharges of Sheila Mitchell and a second employee, and an alleged improper reprimand of a third employee for union activity.

Following separate hearings, the Board issued its decision in both cases. It found in the first case, that Home had violated the Act by failing to bargain with the Union and by attempting to deal directly with employees in derogation of its obligations to deal only with the certified bargaining agent. In the second, it found that Home

---

1. Professional and Health Care Division, Retail Store Employees Union, Local 233, chartered by the Union Food and Commercial Workers International Union, AFL–CIO–CLC.

had engaged in coercive and improper conduct both before and after the election and had discriminatorily discharged Mitchell. The charges with reference to the other alleged discharge and the reprimand of a third employee were dismissed. The Board has petitioned to enforce both orders.[2] The petitions for enforcement of both orders have been consolidated by agreement for appeal purposes.

■ Initially, Home raised a number of jurisdictional objections to enforcement of either order. One of these—a claim of immunity from Board jurisdiction on religious or First Amendment grounds—was abandoned on appeal by Home. In its other jurisdictional objection, Home asserted that it, as a traditional charitable non-profit, non-commercial institution, was "outside the bounds of Board jurisdiction absent a showing of 'massive impact on interstate commerce,'" and argues that the record was devoid of a showing of "massive impact on interstate commerce" in its operations. We find this argument fully answered in *N.L.R.B. v. Kent Cty. Ass'n for Retarded Citizens,* 590 F.2d 19, 20–22 (1st Cir. 1978). Appellee's citation of *N.L.R.B. v. Lighthouse for Blind of Houston,* 653 F.2d 206 (5th Cir. 1981) to the contrary is not apposite. The issue there was whether blind persons who produced items for sale by the Lighthouse were "employees" within the meaning of the National Labor Relations Act. The Court found that the status of such persons was more analogous to "client" than to "employee" and for that reason held the Act inapplicable. On the other hand, there is no dispute that the "employees" involved in this proceeding were "employees" within the meaning of the Act.

The real issues on appeal, however, relate to the substantive charges of violations of the Act by Home. These, as found by the Board, were: (1) a refusal to bargain in good faith with the Union; (2) illegal

threatening, restraining and coercing employees in the exercise of their organizational rights guaranteed by section 7 of the Act; and (3) the illegal discharge of Sheila Mitchell because of her activities on behalf of the Union. Ancillary to the first charge were the employer's objections to the certification election and its exceptions to the denial of a hearing on such objections, as well as the Board's contentions that the employer had attempted to deal directly with its employees in derogation of its obligation to deal only with the Union as the employees' bargaining representative. We shall consider these charges in reverse order, since the resolution of the propriety of the claim on behalf of Sheila Mitchell impacts to a more or less degree the other charges.

The critical point in connection with Sheila Mitchell's claim of discriminatory discharge is whether her status was that of a "supervisor" as that term is defined in the Act. If she were, it is uncontested that the Board had no jurisdiction to review her discharge, to order reinstatement or to grant back-pay. An employee is declared by the Act to be a supervisor if he or she has authority "to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action," provided the exercise of such activity "is not of a merely routine or clerical nature, but requires the use of independent judgment."[3]

■ It has been repeatedly ruled by us that this statutory definition is to be read in the disjunctive and that, if an employee has been delegated the real authority to exercise any one of the statutory powers requiring the use of independent judgment as opposed to being merely routine or clerical, regardless of the frequency of the exercise of such power, that employee, whatever his job title, is to be treated as a supervisor

---

**2.** Reported at 255 NLRB No. 147; 258 NLRB No. 134.

**3.** 29 U.S.C. § 152(11).

under the Act.[4] As the Board itself has put it, "job titles are meaningless; it is the authority vested in the employee, be it expressly or by implication, that is the controlling factor." *Mid-Continent Refrigerated Service Company,* 228 NLRB 917, 920 (1977).

In ascertaining the existence or non-existence of such powers, the Courts and the Board have looked to a number of factors, which, either singly, or in combination, support the existence of such power. Among the most common of these is the authority to assign work or, as we said in *Monongahela Power* "to put [the other employee] to work when and where needed."[5] Another would confer supervisory authority when the employee was empowered to excuse other employees early from work.[6] If the employee can "effectively recommend disciplinary action," that fact has been considered a basis for finding supervisory status.[7] Should an employee have the power to deal with emergencies or if it is his "expertise and judgment on which other employees ... rely", he is generally regarded as one with the power "responsibly [to] direct" as set forth in the Act as a qualification for supervisory status.[8] Perhaps the most significant factor, often noted both in the decisions of the Courts and of the Board, is whether the employee whose status is in question is "the highest ranking employee" on the jobsite at the time to whom other employees must look for direction.[9]

It is recognized, though, that, in some areas, these factors will not be applied inflexibly because of the unique character of the employment. Thus, nursing is a profession in which the nurse normally exercises independent judgment in rendering direct patient care.[10] In such a case, the Board has ruled—and its ruling has generally been accepted by the Courts and by the Congress—that the applicability of the "inde-

---

**4.** *Jeffrey Mfg. Division, Etc. v. N.L.R.B.,* 654 F.2d 944, 950 (4th Cir. 1981); *N.L.R.B. v. Tio Pepe, Inc.,* 629 F.2d 964, 969 (4th Cir. 1980); *N.L.R.B. v. Pilot Freight Carriers, Inc.,* 558 F.2d 205, 207 (4th Cir. 1977), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 723, 54 L.Ed.2d 754 (1978); *Laborers & Hod Carriers Local No. 341 v. N.L.R.B.,* 564 F.2d 834, 837 (9th Cir. 1977), ("Job titles are unimportant"); *Phillips v. Kennedy,* 542 F.2d 52, 55 (8th Cir. 1976) ("the specific job title of the employees involved is not in itself controlling").

**5.** *Monongahela Power Co. v. N.L.R.B.,* 657 F.2d 608, 613 (4th Cir. 1981). *See also, Colorflo Decorator Products,* 228 NLRB 408, 409 (1977).

**6.** *N.L.R.B. v. Pilot Freight Carriers, Inc.,* 558 F.2d at 213.

**7.** *N.L.R.B. v. J. K. Electronics, Inc.,* 592 F.2d 5, 6 (1st Cir. 1979).

**8.** *Monongahela Power Co. v. N.L.R.B.,* 657 F.2d at 613.

**9.** *American Diversified Foods, Inc. v. N.L.R.B.,* 640 F.2d 893, 895–96 (7th Cir. 1981); *Keener Rubber, Inc. v. N.L.R.B.,* 326 F.2d 968, 969–70 (6th Cir. 1964); *Clark Manor Nursing Home Corp.,* 254 NLRB 455, 477–78 (1981); *Colorflo Decorator Products,* 228 NLRB at 410.

**10.** *See N.L.R.B. v. Doctors' Hospital of Modesto, Inc.,* 489 F.2d 772.

The Court in this case enforced the order of the Board as reported in 175 NLRB 354 (1969). As the Board report shows, the hospital argued that "all the registered nurses employed in its hospital [were] supervisors as defined in the National Labor Relations Act and that, therefore, a unit composed entirely of such registered nurses is inappropriate." The Regional Director found that registered nurses "are a highly trained group of professionals who normally inform other, lesser skilled, hospital employees as to the work to be performed for patients, but that their duties and authority in this regard are solely a product of their highly developed professional skills and do not constitute an exercise of supervisory authority in the interest of their employer." 175 NLRB at 354. On appeal to the Board, this decision of the Regional Director was significantly modified. The Board agreed that all nurses were not to be considered supervisors under the Act but decided that the "floor head nurse" who, on each of three shifts, was on duty in each of the four wings of the hospital and the operating room supervisor were all supervisors. 175 NLRB at 354 and 355. This ruling was upheld by the Court. The Board left open whether other "head nurses" working in other departments were supervisors. 175 NLRB at 355. The ruling of the Board, as enforced by the Court, supports the contention of Home that Mitchell, whose duties, when Patillo was off-duty, were certainly as great, if not greater than the "floor head nurses," qualified as a supervisor under the Act.

pendent judgment" test in determining a nurse's supervisory status depends on whether the exercise of judgment by her is merely "an *incident* of professional service or [is] *in addition* to professional services." [11] On the other hand "routine" or "clerical" duties as indicia of supervisory authority are not to be construed as a requirement of "a high degree of skill and technical competence" in order to qualify an employee as a supervisor. As the Court put it in *American Diversified Foods, Inc. v. N.L.R.B., supra,* 640 F.2d at 897: "The fact that the work the [employee] supervises is not complex and does not require close attention does not weaken a finding of supervisory status."

■ We recognize that the determination of whether the facts in any case meet the statutory test for supervisory status is within the Board's assumed expertise and its findings in that regard are to be accepted if supported by substantial evidence on the record as a whole. But, when, on a careful review of the record, we are unable "conscientiously [to] find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view," we may deny enforcement. *Universal Camera Corp. v. Labor Board,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). And this should be particularly true when the Board is determining supervisory status because of the inconsistency in the Board's application of the statutory definition and of the factors to be used in determining such application. So manifest has this inconsistency been that a commentator recently has aptly observed that "the Board has [so] inconsistently applied the [statutory] definition" of supervisor as to cause one necessarily to speculate "that the pattern [of Board decisions on supervisory status] displays an institutional or policy bias on the part of the Board's employees" as illustrated by a practice of adopting that "defi-

nition of supervisor that most widens the coverage of the Act, the definition that maximizes both the number of unfair labor practice findings it makes and the number of unions it certifies." Note, *The NLRB and Supervisory Status: An Explanation of Inconsistent Results,* 94 Harv.L.Rev. 1713 at 1713–14 and 1721 (1981). For this reason, courts must carefully scrutinize the Board's finding and the record on supervisory status.

■ Considering all the facts relating to the employment of Sheila Mitchell in the light of the statutory definition of "supervisor" and the decisions construing that definition already noted, we conclude that the Board's finding that she was not a supervisor is not supported by substantial evidence. There is no dispute that on two of the five days worked each week on the third shift, Mitchell was the highest ranking official present at the Home and was in charge, or, as the employees describe her status, was the "boss" at the Home for that shift (the only shift on duty in the Home at that time), and was so recognized by her employer and the employees. Her duties and authority were similar to those of the "charge nurse" in *Norwood Manor,* 260 NLRB No. 110, 109 LRRM 1226 (1981), and to those of the RN McPartland in *Clark Manor Nursing Home Corp.,* 254 NLRB 455, 477–78 (1981), in both of which the Board found that the employee involved was a supervisor, and greater than those of the "floor head nurse" found to be a supervisor in *N.L.R.B. v. Doctors' Hospital of Modesto, Inc.* To be specific, she was the "only person directing the day-to-day activities of the people on that shift, including the recommendation of discipline, assignments, shifts, or swaps of assignment." The exercise of such supervisory responsibilities of Mitchell was not sporadic but was on a regular basis for 40 per cent of Mitchell's employment; it involved not activities which were but "incident[s] of professional service but it intimately involved supervi-

11. *See,* Sen.Rep.No. 766, 93rd Congress, 2d Sess. 6 (1974), U.S.Code Cong. & Admin.News 1974, 3946, 3951.

sory activities and responsibilities" in addition to professional services for the whole Home during the period of that shift. She had both the right and the responsibility to "direct" the employees on the shift as "responsibly" as the employee found to be a supervisor in *Monongahela Power.*

The Board's suggestion that during the time Mitchell was in complete charge of the Home, her activities "related exclusively to patient care" is patently inaccurate. If any assignment had to be made or if any emergency arose at the Home or if any responsible directions were to be given, the person to whom had been delegated that authority was Mitchell. If any employee became sick, the duty to assign someone in her stead or, if any employee asked to be excused early from work, the authority to make the assignment or to grant the excuse was that of Mitchell. Mitchell herself, even though she was testifying in support of the Board's position, conceded that if anything untoward happened on the shift it was she who "got the heat," in other words, she had the full responsibility of the Home's operations, including the care and treatment of the patients. And the Board itself found as a fact that "Mitchell on two of her five weekly shifts alone had ultimate responsibility for her shift." It is irrelevant how often she had such responsibility, for it is the power and not the frequency of its use which is dispositive. *See Jeffrey Mfg. Division, Etc. v. N.L.R.B.,* supra, 654 F.2d at 948.

█ Perhaps the most significant fact in this case on the question of Mitchell's status is the Board's position on the status to be accorded Patillo. The Board found that Patillo was a supervisor, whose conduct and statements could accordingly be attributed to Home. The Administrative Law Judge in his decision, accepted by the Board, declared that Patillo was "an admitted supervisor on that shift." This concession that Patillo was a supervisor appears also in the brief filed by the Board in this Court: "The record shows that Georgia Patillo was the RN on the night shift; further, she was admittedly a supervisor." Yet the Board

found that under the evidence, Mitchell, who for 40 per cent of the shift week replaced Patillo in charge of the third shift, performing exactly the same duties and having the same responsibilities which Patillo had when she was on duty, was not a supervisor. This represents an inconsistency in findings of supervisory status involving two employees whose duties and responsibilities were the same. It is difficult to avoid the conclusion that the reason for the inconsistency in the two findings is the very one identified by the commentator in the Harvard Law Review cited *supra.* The Board sought to support its charge of coercion against the Home by attributing to its responsibility for certain alleged statements made by Patillo. Such attribution depended on Patillo being found a supervisor. However, if the Board found Mitchell a supervisor, the Board would have been without power to order her reinstatement. Ergo, the Board, on exactly the same facts of which it had found Patillo a supervisor, found Mitchell not to be a supervisor, and accordingly ordered her reinstatement with back-pay. We agree with the argument of the Board that there is substantial support in the record for the Board's finding that Patillo was a supervisor. By the same token, we cannot conscientiously conclude that there is substantial evidence in the record as a whole to support a finding that Mitchell, who on two days of the five-day week performed exactly the same functions and exercised exactly the same powers, was not a supervisor.

We find ample support for our conclusion in this regard in the recent case of *American Diversified Foods, Inc. v. N.L.R.B.,* supra, 640 F.2d at 895–96, which is very similar on its facts to this case. Involved there was the status of a shift manager of an ARBY restaurant. The shift manager was "third in the ARBY hierarchy behind the store manager and one or two assistant managers, but ahead of approximately 25 counter employees." The restaurant was open seven days a week on two eight-hour shifts each day. On the fourteen shifts the restaurant operated, the store manager was the duty manager for four shifts, the assist-

ant manager was duty manager for four shifts, and the shift manager acts as duty manager for the remaining six which normally are the "evening" or "weekend" shifts. Under this arrangement the shift manager was a duty manager for about 40 to 60 per cent of his time, with the remainder spent as a regular counter employee. During the time he was duty manager, the shift manager was "the highest ranking employee in the restaurant," again just as Mitchell was "the highest ranking employee in the Home" when she was on duty on Patillo's off-days. As duty manager, he had the authority to assign "counter employees to specific jobs, replacing absent employees, and sending employees home when they are sick or when work is slow."

The Board in that case held that shift managers were not supervisors, finding that they lacked the authority "to hire, fire, transfer, or discipline counter employees" and that "work assignments and opening and closing responsibilities were routine and did not require the exercise of independent judgment." The Court reversed, holding first, as had the Board itself in *Dunkirk Motor Inn, Inc., d/b/a Holiday Inn of Dunkirk-Fredonia,* 211 NLRB 461, 462 (1974), that "[t]he test of responsible direction does not depend on the complexity and difficulty of the . . . work . . . . Adoption of that test would unrealistically rule out a finding of responsible direction in all situations where the work involved does not require a high degree of skill and technical competence." It proceeded to find that it was unimportant that the exercise of supervisory authority involved only 40 per cent of the shift managers' time because the status "does not require the exercise of the power described for all or any definite part of the employee's time," and finally it considered the decision of supervisory status in the

case to be controlled by "[t]he fact that the questioned employees [were] the ranking employees present at the worksite" at the times when they were duty managers.[12] It accorded to the shift managers supervisory status.

We agree with the result reached in *American Diversified Foods.* To hold differently would be contrary to repeated decisions of the Board itself and would not be consonant with the statutory definition of "supervisor." Accordingly Mitchell was properly classified as a supervisor under the Act and the Board was, as we have said, without jurisdiction over her claim of discriminatory discharge. We, therefore, refuse to enforce the order requiring her reinstatement.

█ Having found substantial evidence to support a finding of supervisory status for Mitchell, we turn to the other issues in the proceedings. The first of these is Home's contention that it presented sufficient evidence of coercive conduct tainting the fairness of the certification election to require the holding of a hearing on such claim. The evidence in support of this claim consisted in part of actions and statements by Mitchell which occurred two or three months before the election while Mitchell was still employed at the Home. We cannot fault the Regional Director's conclusion that the extended time period between the alleged coercive conduct and the election itself is such that any assumption that such conduct prejudiced the fairness of the election was too tenuous to require a hearing.[13] The other circumstances cited by Home in this connection relate to several threatening anonymous telephone calls made to off-duty employees of the Home. No one identified the caller nor was

---

**12.** 640 F.2d at 896.

**13.** *See N.L.R.B. v. Manufacturer's Packaging Co., Inc.,* 645 F.2d 223, 226 (4th Cir. 1981). In this case the Court stated the controlling rule thus:

"[w]hether pro-union supervisory activity is sufficient to overturn an election depends on the facts and circumstances of each case. The critical inquiry is whether the supervisors' pro-union activities prevented employees from freely effectuating their collective choice. *Schneider Mills, Inc. v. NLRB,* 390 F.2d 375, 378 (4th Cir. 1968). Employees' free choice is stifled and an election may be set aside if the supervisors' activities 'contain the seeds of potential reprisal, punishment, or intimidation.'"

there any evidence connecting the Union or its representatives with these calls. Absent any such connecting evidence, such showing did not mandate a hearing on Home's objections to the election. It follows that the certification of the Union by the Board on the basis of the election, was supported by the record and Home violated the Act by refusing to bargain with the Union, and by dealing directly with the employees rather than through the certified bargaining agent after the Board had certified the agent.

There was evidence in the record, too, of attempted harassment, coercion and intimidation on the part of certain employees of Home, whose conduct was properly attributable to Home, for the purpose of discouraging union activity. Among these were Jolly, the hospital administrator, and Patillo, an "admitted" supervisor. The Board, also, found improper Home's "no solicitation" rule and the activities of one Shouse, who was employed by Home to perform some consultative services. Had we been the factfinder, we may have concluded contrary to the result reached by the Board that this evidence established harassment, coercion and intimidation but ours is not the responsibility of evaluating the evidence and determining the credibility of the witnesses. That responsibility rests with the Board and we are compelled to enforce its findings in these respects if they are supported by substantial evidence. There was substantial evidence sustaining this finding of the Board.

In summary, we deny enforcement of the Board's order requiring the reinstatement of Sheila Mitchell with back-pay, but enforce the Board's order finding a refusal of Home to bargain, and granting remedial relief for coercive and harassing conduct by Home for the purpose of restraining its employees in their organizational rights.

Enforcement granted in part and denied in part.

MURNAGHAN, Circuit Judge, concurring in part and dissenting in part:

Were the panel of Fourth Circuit judges hearing the appeal the trier of fact, I would find the majority opinion quite persuasive. On appeal, however, the sole question is whether substantial evidence supports the Board's finding that Mitchell was not a supervisor. Upon reviewing the record, I conclude that the Board's finding is supported by substantial evidence. In making a finding opposite to that of the Board, my colleagues have disregarded the considerable body of evidence which supports the Board's finding.

At the outset, one should observe that the determination of supervisory status is particularly difficult in the health care context. When the 1974 amendments to the National Labor Relations Act were passed, a Senate Committee observed:

[T]he Board has carefully avoided applying the definition of "supervisor" to a health care professional who gives direction to other employees in the exercise of professional judgment, which direction is incidental [to] the professional's treatment of patients, and thus is not the exercise of supervisory authority in the interest of the employer.

S.Rep.No. 766, 93rd Cong., 2d Sess. 6, *reprinted in* [1974] U.S.Code Cong. & Ad. News 3946, 3951. Thus, when the exercise of independent judgment is incidental to the treatment of patients, it does not confer supervisory status. *Beverly Enterprises v. NLRB*, 661 F.2d 1095, 1098–1103 (6th Cir. 1981); *Misericordia Hospital Medical Center v. NLRB*, 623 F.2d 808, 815–18 (2d Cir. 1980); *NLRB v. St. Francis Hospital*, 601 F.2d 404, 420–22 (9th Cir. 1979). Consequently, the issue here is simply whether substantial evidence supports the Board's finding that Mitchell exercised independent judgment only incidentally to her treatment of patients.

The evidence showed that three nights a week, Mitchell was directly responsible to Georgia Patillo, the registered nurse on the night shift. On the other two nights, however, Patillo was not on duty. If an unexpected situation arose which Mitchell could not handle herself, she informed Patillo, or, if Patillo was not on duty, called the head nurse, Janis Goodmundsen. If a child re-

quired hospitalization and Patillo was absent, Mitchell exercised her professional judgment to decide whether to contact the head nurse or the doctor. If it became necessary to obtain a substitute for an absent aide, Mitchell informed Patillo or, when she was on duty alone, contacted Goodmundsen for permission to call in another aide.

With respect to the conduct of aides, Mitchell testified that, if an aide failed to follow correct procedures, she informed Patillo. Mitchell reported misconduct by aides to Patillo or Goodmundsen, but was not authorized to recommend disciplinary action.

The majority has concluded that Mitchell's responsibilities " 'intimately involved supervisory activities and responsibilities' in addition to professional services." At 1067–1068. There is, of course, evidence to support that conclusion. On appeal, however, we cannot pick and choose among items of conflicting evidence in order to support a conclusion different from that reached by the Board. The evidence discussed above indicates that Mitchell's authority was narrowly circumscribed; whenever a matter arose which called for supervisory action, she reported to Patillo or Goodmundsen, without making a recommendation. Thus, her independent authority was limited to problems incidental to the treatment of patients.[1] That, in my view, ends our inquiry.

The majority's reliance on *N.L.R.B. v. Doctors' Hospital of Modesto, Inc.,* 489 F.2d 772 (9th Cir. 1973), illustrates the fallacy in its opinion. The majority emphasizes the Board's finding there that the "floor head nurses" were supervisors. Here, however, the Board reached the opposite conclusion with respect to Mitchell. To insist on consistency between the two cases is to go beyond our limited function. We must determine only whether the Board's findings were supported by substantial evidence. The fact that a different Board finding would have been supported by substantial evidence has no bearing on our inquiry.[2]

The majority is unable to cite a single case in which a Board finding that a nurse was not a supervisor was reversed. In fact, the courts have consistently accepted findings that nurses with considerably more authority than Mitchell were not supervisors. For example, in *Misericordia Hospital Medical Center v. NLRB, supra,* 623 F.2d at 815–18, the Second Circuit affirmed the Board's finding that the head nurse of a hospital unit, who had twenty-four hour responsibility. for the unit and was in charge of three assistant nurses, ten nurses, and ten aides and technicians, was not a supervisor. The nurse in that case filled out evaluation forms on employees in her unit, selected nurses for training programs, and offered instruction in patient care techniques. Nevertheless, the court concluded that the Board was entitled to determine that she did not have the authority effectively to recommend the promotion or discharge of employees, and that her other responsibilities were incidental to patient care. *See also NLRB v. St. Francis Hospital, supra,* 601 F.2d at 420–22 (accepting the Board's finding that Assistant Head Nurses, who were sometimes the most senior persons present at the hospital, were not supervisors); *NLRB v. Doctors' Hospital of Modesto, Inc., supra,* 489 F.2d at 776 (accepting the Board's finding that registered nurses, who sometimes assigned and directed auxiliary personnel, were not supervisors).

---

1. Mitchell's testimony that she "got the heat when something went wrong on the shift," relied on by the majority, does not support the conclusion that she was a supervisor. Mitchell went on to agree that she had, in the past, taken responsibility "because of something an aide did or did not do that was not compatible with patient care." At no time did she acknowledge, as the majority implies, any authority with respect to matters not pertaining to patient care.

2. For the same reason, the majority's reliance on *Norwood Manor,* 260 N.L.R.B. No. 110 (March 11, 1981), and *Clark Manor Nursing Home Corp.,* 254 N.L.R.B. 455 (1981), is misplaced. Had the Board found, as it did in those cases, that Mitchell was a supervisor, our inquiry would be a very different one, limited to determining whether there was sufficient evidence in the record to support that finding of fact.

Accordingly, I am compelled to dissent. The majority pays lip service to, but in the end disregards, our limited role on appeal. An appellate court "may not 'displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *NLRB v. Aerovox Corp.*, 435 F.2d 1208, 1209 (4th Cir. 1970), *quoting Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). Since the Board's findings with respect to Mitchell's status, as well as its other findings, are supported by substantial evidence, I would grant enforcement of the entire order.