**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LIGHTHOUSE FOR the BLIND OF HOUSTON, Respondent.**

No. 80–1753.

United States Court of Appeals,
Fifth Circuit.

Unit A

Aug. 10, 1981.

Elliott Moore, Deputy Associate Gen. Counsel, Sandra Williams, N. L. R. B., Washington, D. C., for petitioner.

Alfred G. Albert, Acting Sol. of Labor, Donald S. Shire, Barbara E. Kahl, U. S. Dept. of Labor, Washington, D. C., for amicus curiae Secretary of Labor.

Eric H. Nelson, Houston, Tex., for intervenor Teamsters Local No. 968.

Liddell, Sapp, Zivley, Brown & Laboon, W. Robert Brown, Douglas R. Little, Houston, Tex., for respondent.

Bert N. Bisgyer, Washington, D. C., for amicus curiae National Federation of the Blind.

Before BROWN and GARZA, Circuit Judges, and BEER *, District Judge.

BEER, District Judge:

The National Labor Relations Board seeks to enforce its order of April 24, 1980, against the Lighthouse for the Blind of Houston ("Lighthouse," hereinafter). The Board's decision and order is reported at 248 NLRB 1366. Our jurisdiction arises by virtue of § 10(e) of the National Labor Relations Act (NLRA), 29 U.S.C. § 151, et seq.

The Board concluded that the Lighthouse violated § 8(a)(5) and (1) of the NLRA by refusing to bargain with the General Drivers, Warehousemen and Helpers Local Union 968 affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Union," hereinafter), which had been certified as the exclusive bargaining representative of a production and maintenance unit of employees in the Lighthouse's Workshop A, and by refusing to furnish to the Union relevant wage and employment information concerning such employees. In so doing, the Board rejected the Lighthouse's contentions that the Board did not have statutory jurisdiction over it; that, even if the Board had statutory jurisdiction, it would not effectuate the purposes of the Act to assert jurisdiction over the Lighthouse; and that the blind employees in Workshop A were not "employees" within the meaning of the NLRA. We find that the Board's order is not supported by substantial evidence and that the Lighthouse has not unlawfully refused to bargain with the Union.

Lighthouse for the Blind of Houston is a nonprofit, charitable corporation with a principal office and place of business in Houston, Texas. A 35-member board of directors presides over and directs its operation. No member of the board of directors receives compensation for his services. The largest single group of board members are ladies who have served as volunteers at the Lighthouse in the past 20 years. The rest of the board members come from a cross section of the business and civic community of Houston. In providing social and technical services to blind people in the Houston area, the Lighthouse divides its operation into five departments: social services, volunteer services, library and special services, rehabilitation and industrial. The social services division provides social work and recreational services both at the facility and at the individual's residence to assist blind persons. The volunteer services division provides volunteers to support the various operations of the Lighthouse. The Lighthouse has a library and special services division, which makes braille, large print and talking books available for the unsighted community. The rehabilitation division offers vocational training which is geared toward helping visually impaired persons adapt to their surrounding environment. The fifth department, referred to by the parties as the Industrial Division, employs blind people to manufacture a product for sale, e. g. felt-tipped pens, mops, commercial scrub brushes, disinfectants and detergents. Pursuant to contracts with the U. S. General Services Administration (GSA), many of the felt-tipped pens, as well as the detergent and the disinfectant, are supplied

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

to federal government agencies pursuant to the Wagner O'Day Act, 41 U.S.C. § 46, et seq. (1970).

In 1977, the Industrial Division generated $4,620,000 in revenue from sales of the merchandise mentioned above. This resulted in a so-called profit of $237,000 which was then fed back into the Lighthouse's overall operation. Designation of this amount as "profit" depends, of course, on the bookkeeping methods applied. While there is serious doubt that an actual business-based "profit" was, in fact, earned, there is no doubt that the accounting methods here applied did, in fact, result in a profit figure.

The Industrial Division is divided into Workshop A and Workshop B. Workshop B employees are blind persons who, in many instances, have multiple handicaps and are, thus, unable to be fully productive. Some of these individuals have, after training and rehabilitation in Workshop B, "graduated" to Workshop A.

Workshop A employs approximately 70 individuals, 62 of whom are blind or have severe visual impairments. They perform a variety of packaging and assembling jobs; produce felt-tipped pens, mops and commercial scrub brushes; and bottle disinfectants and detergents. They also perform subcontracting work for various private companies, e. g. assembling fishing rod holders, doing grease check assembly jobs and filling notebook binders with inserts.

Workshop A employees are all paid at least the federal minimum wage for their work. At the time of the representative hearing below, wages in Workshop A ranged from $2.89 per hour to $3.25 or $3.40 per hour, the variations depending on differing levels of productivity. All the Workshop A employees are covered for workmen's compensation, unemployment insurance, hospitalization insurance, certain pension rights, and receive nine paid holidays per year. These workers also receive certain other benefits which vary according to their tenure, including vacation and sick leave.

Workshop A employees are eligible to receive merit raises based on productivity; however, merit raises are subject to recission if production subsequently drops. The progress of each of the workers in Workshop A is evaluated twice a year.

The supervisors in Workshop A are, generally, former workers in Workshop A. Most of them are blind. They have limited authority to check time cards to make sure that all workers are present, dock workers who are late, approve requests to leave work early or to not come in on a particular day. With regard to discipline, the Lighthouse attempts to resolve problems with its workers by counseling. If a problem can be corrected by counseling and discussion, it is. If a problem persists, it is usually referred to the general manager of the Lighthouse, who then attempts to personally resolve the problem. Failing this, the matter is referred to a workers' committee made up of workers in all departments who are elected each year by the workers themselves. This committee can make final decisions with respect to suspension or termination. In the last four years (prior to 1977), there have been three terminations authorized by this committee. This committee also meets to consider problems of the Lighthouse in general. They are kept informed as to what is projected for the future, the schedule for production, new items being worked on, the holiday situation, vacation schedules and general administration. The Lighthouse has no formal program for placement of blind workers but does attempt to place individuals in private industry on an ad hoc basis, particularly with certain employers. Over the years, there has been an average of four persons a year placed in private employment through Lighthouse-sponsored efforts. Unfortunately, experience indicates that the private sector is not very anxious to hire blind and multi-handicapped workers.

The issues presented here are whether the Board properly asserted jurisdiction over the Lighthouse and whether the Board properly determined that the blind and multi-handicapped workers in the Lighthouse's Workshop A facility are employees covered by the National Labor Relations Act.

A review of the National Labor Relations Act of 1935, 29 U.S.C. § 151, et seq., and its legislative history leads to the conclusion that Congress did not intend or expect the exercise of jurisdiction by the Board over nonprofit institutions in general that do not affect commerce. *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979).

It is clear from the facts cited above that the individuals who comprise Workshop A and whom the Union now seeks to represent are employees in the generic sense of the word. Those individuals work for a set number of hours a day, perform functions which are of recognized economic value and are paid for the performance of those functions. However, the fundamental relation between those individuals and the Lighthouse is different in many significant aspects from a normal employment relationship.

The focus of the Lighthouse's employment concern is upon rehabilitating its clients and providing the maximum service possible to sheltered workshop clients. For example, regular employees in a typical industrial environment are hired because they have the skill and ability to perform the work involved. Workshop clients, on the other hand, are referred to the workshop by a counselor or social worker precisely because of their inability to perform work in the competitive job market.

The disciplinary structure is not handled in the same manner as in the private industry. When infractions occur, supervisory personnel sit down with the client, talk to him, and try to find out if there was a reason for his problem. If the client cannot be helped in the area where he is working, he is moved to another area. Only if the problem is critical and cannot be handled with counseling, are harsher measures used. Disciplinary discharges are extremely rare. Furthermore, wage payments based on productivity are completely consistent with the rehabilitative purposes of the sheltered workshop. 29 U.S.C. § 214(c) specifically authorizes sheltered workshops' payment to workers to be based upon severity of handicap and productivity. Such payments do not transform a sheltered workshop into an enterprise in which decisions are governed by economic considerations, rather payments relating to productivity are an integral part of the service provided by the workshop. They foster the goal of rehabilitation by providing an incentive to employees to learn the skills and, thus, become sufficiently acclimated to a work environment to move eventually from the sheltered workshop into the competitive job market.

It is certainly true that the Lighthouse's activities are governed, to some extent, by economic considerations. They must pay sufficient attention to economics to maintain a viable entity capable of rendering necessary rehabilitation services. However, the so-called $237,000 profit made by the Lighthouse in 1977 represents only a negligible impact on commerce, in light of all the circumstances here. If it were not for the moneys received from the federal government, as well as other charitable agencies, the Lighthouse would have lost money in fiscal 1977. Further, the vast majority of the products produced at the Lighthouse go to the General Services Administration of the United States government pursuant to the Wagner O'Day Act. Under this statute, the GSA must purchase the Lighthouse products at a price fixed by a presidential committee. 41 U.S.C. §§ 46–48.

Moreover, it is undisputed in the record that the main purpose of the Lighthouse is to provide a wide range of services to blind and disabled persons in order to enhance the quality of their lives including a serious effort to provide its clients with experience which may lead to employment in the competitive job market. When the Lighthouse receives word of a job that is available in private industry, Lighthouse staff personnel are sent to the job site to assist in fully developing that job for a blind worker. Though approximately 50% of those placed in outside private industry find it necessary to return to the Lighthouse, those who return are never refused.

This unusual "employer-client" relationship centers around a concern for the wel-

**210**

fare of the clients. To require collective bargaining in this context is to risk intrusion into the rehabilitative process by bargaining demands which could prejudice the Lighthouse's many faceted efforts at rehabilitation.

Although the Lighthouse clients who are employed in Workshop A are arguably employees within the meaning of the Act, it will not effectuate the purposes of the Act to assert jurisdiction over them. *Goodwill Industries of Southern California*, 231 NLRB 536 (1977).

The Board's contended differentiations between *Goodwill Industries*, supra, and the case at bar are not, in our view, significant. The Board contends that the Lighthouse workers are paid variable wages based upon performance and productivity, and are disciplined using "normal economic and business considerations." As previously noted, the variable wage policy is designed to foster rehabilitation, and discipline procedures certainly vary from those in effect in private industry. On the whole, clients are counseled rather than disciplined, and they are rarely, if ever, discharged. In fact, the record reflects that the Lighthouse's employment policies are commensurate with its rehabilitative objective. Thus, we conclude that the Board's order is not supported by substantial evidence; that the Lighthouse has not unlawfully refused to bargain with the Union.

The Board's application for enforcement of its order is denied.

ENFORCEMENT DENIED.