**CINCINNATI ASSOCIATION FOR THE BLIND, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 79–1522.

United States Court of Appeals, Sixth Circuit.

Argued June 19, 1981.

Decided and Filed March 17, 1982.

Harold S. Freeman, Stephen S. Eberly, Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, William Stewart, N. L. R. B., Washington, D. C., for respondent.

Jerome Ackerman, Wynne M. Teel, Covington & Burling, Washington, D. C., for amicus curiae Nat. Industries for the Blind.

George H. Colin, Baer, Marks & Upham, New York City, for amicus curiae Nat. Accreditation Council for Agencies Serving the Blind and Visually Handicapped.

Carin Ann Clauss, Donald S. Shire, Mary-Helen Mautner, Barbara E. Kahl, U. S. Dept. of Labor, Washington, D. C., for amicus curiae Secretary of Labor.

Before MERRITT, MARTIN and JONES, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

This case comes before us on the petition of the Cincinnati Association for the Blind for review of cease and desist and bargaining orders issued by the National Labor Relations Board. The Board has cross-applied for enforcement of its orders. We

must determine whether the Board abused its discretion in deciding that visually handicapped workers at the Association's Sheltered Workshop for the Blind are entitled to the protection of the National Labor Relations Act.

In May, 1977, the Communications Workers of America, Local 440, filed a representation petition seeking certification as the collective bargaining representative of the Workshop employees. At a hearing held in August, 1977, the Communications Workers disclaimed further interest in the proceedings; however, Local Union 100, a Teamsters affiliate, came forward and asked to be substituted for the Communications Workers as the petitioner. The Board agreed to the substitution. Local 100 sought to represent "all production and maintenance employees" at the Workshop, a group which included both sighted and visually handicapped workers.

Over the Association's objections, the Board decided that the handicapped workers were "employees" covered by the National Labor Relations Act, asserted jurisdiction, and issued a Direction of Election. 235 N.L.R.B. 1448. An election was duly held in June, 1978 and produced a clear union majority. The Association refused to bargain with the Union, whereupon the Union brought unfair labor practice charges. On September 19, 1979, the Board issued the orders presently on appeal. 233 N.L.R.B. 1140.

The Association asks us to hold that its visually handicapped workers fall outside the purview of the Act. In support of this position, it characterizes those workers not as "employees", but as "clients", whose relationship with the Workshop is rehabilitative or therapeutic rather than typically industrial. The Association raises a second issue by objecting to the Board's certification of a bargaining unit which includes both sighted and handicapped workers.

The Board, on the other hand, contends that its application of the Act to visually handicapped workers is entirely consistent with the statutory purpose. It also defends its approval of a single bargaining unit as a proper exercise of discretion.

Before addressing the merits of this case, we believe a brief description of the Cincinnati Workshop is appropriate as background for the legal arguments.

The Cincinnati Association for the Blind is a non-profit corporation dedicated to the interests of visually handicapped persons in the Cincinnati area. It is organized into five operationally distinct departments: Finance, Office, Casework, Rehabilitation, and Workshop. The Casework and Rehabilitation departments offer training, counseling, technical and social services to all blind members of the community.

Some of the individuals who make use of the Association's social services are referred by caseworkers to the Workshop for possible employment; final employment decisions, however, are the province of the Workshop Manager. At present, about seventy blind persons and four sighted persons perform jobs at the Workshop under the supervision of a managerial staff which includes, in addition to the Manager, four supervisors, a contract sales representative, and an industrial engineer.

The Workshop produces goods under contract with the federal government and a number of private industries. Some of these contracts are secured pursuant to the Wagner-O'Day Act, some through competitive bidding. The Workshop is involved in several types of production, including a paper conversion manufacturing operation, which supplies over half the adding machine tape and teletype paper used by the federal government, and a sizeable assembly and packaging operation which serves several private corporations. In 1976, the Workshop generated revenues in excess of $2,000,000, $144,000 of which represented profit. The Association used this profit to defray unrelated expenses.

With very few exceptions, the blind workers are paid on a piece-rate basis, whereas the sighted employees are paid by the hour. The Fair Labor Standards Act permits sheltered workshops to pay certain handicapped workers less than the current

minimum wage; the Cincinnati Workshop holds a certificate of exemption, issued by the Department of Labor, which authorizes a special minimum wage of $1.49 per hour. The Association's blind workers receive holiday pay, vacation pay, workers compensation insurance, and life insurance. Sighted employees receive the same benefits plus a pension plan. Blind and sighted workers alike have a five-day, 8:30 a. m. to 4:30 p. m. work week.

The Workshop does not suspend or terminate blind workers for production errors; those forms of discipline are reserved for serious cases of misconduct such as violence or theft. However, the workers are expected to produce goods which conform to the quality standards of the marketplace. If a handicapped worker receives two reprimands for production errors, he is referred to the Work Evaluation Unit for "retraining." During assignments to this Unit, workers are either not paid at all or paid at a lower rate than they customarily receive.

The Workshop operation is not designed primarily to provide temporary, on-the-job training which would enable blind workers to secure employment elsewhere. On the contrary, the program contemplates long-term employment at the Workshop. Very few handicapped workers ever leave to enter the competitive job market.

We turn now to the principal substantive issue before us—the Board's application of the National Labor Relations Act to the Association's visually handicapped workers. The Association challenges the decision below on two grounds: first, it contends, the workers in question are not "employees" within the meaning of the Act; and second, even if these workers are statutory "employees", the Board abused its discretion in exercising jurisdiction over them.

We have given both arguments careful consideration and have at length concluded that endorsement of either would exceed the proper bounds of judicial action.

The National Labor Relations Act does not attempt a precise definition of an "employee." Section 2(3) merely states that the "term 'employee' shall include any employee ... unless this subsection explicitly states otherwise." 29 U.S.C. § 152(3). None of the statutory exceptions bear on this case.

The Association's most serious legal argument that handicapped workers in sheltered workshops fall outside the purview of the Act rests on the premise that Congress intended to exclude them from coverage. If this contention is valid, then the Board exceeded its statutory jurisdiction here.

We have found nothing in the Act's legislative history to indicate that Congress considered the status of handicapped workers at the time it enacted the statute. The Association points out that between 1967 and 1976 several bills were introduced in the House of Representatives with the following preamble: "A bill to amend the National Labor Relations Act to secure to physically handicapped workers employed in sheltered workshops the right to organize and bargain collectively...." 113 Cong. Rec. 12754 (1967); 113 Cong.Rec. 18355 (1967); 115 Cong.Rec. 7575 (1969); 115 Cong.Rec. 6561 (1969); 117 Cong.Rec. 179 (1971); 119 Cong.Rec. 59 (1973); 122 Cong. Rec. 9176 (1976). At each introduction, this bill was referred to the House Committee on Education and Labor, where it apparently remained. This information, standing alone, is inconclusive of the issue. It reflects only the opinion of the bill's sponsor that the Act in its present form does not protect handicapped workers. We have no indication that a consensus of Congress shares this belief.

In the absence of direct evidence of Congressional intent, the Association asks us to infer from other legislation that the Act does not apply to sheltered workshop workers. It directs our attention to the legislative histories of the Fair Labor Standards Act, 29 U.S.C. § 214(c), the Wagner-O'Day Act, 41 U.S.C. §§ 46–48, and the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq.[1]

---

1. The Fair Labor Standards Act provides employment opportunities for handicapped work-

ers by permitting workshops to pay wages lower than the prevailing minimum wage. The

According to the Association, these histories demonstrate that Congress has recognized and approved the "rehabilitative" and "therapeutic" function of sheltered workshops. To some extent, at least, this observation is correct. We do not doubt that Congress has indeed sought to benefit the handicapped through legislation favoring sheltered workshops; we are not persuaded, however, that this policy necessarily implies a Congressional intent to exclude handicapped workers from the National Labor Relations Act.

It is the Association's position that the introduction of collective bargaining into the sheltered workshop milieu will inevitably destroy the "therapeutic" effect of the workshop experience on the individual worker. Thus, argues the Association, if Congress was disposed to permit collective bargaining in sheltered workshops, it would not, in other legislation, address the sheltered workshop concept in the language of "rehabilitation" and "therapy."

We perceive two flaws in this argument. First, Congress has not indicated that it shares the Association's belief in the fundamental incompatibility of collective bargaining and any form of "therapy." Neither has it expressed a contrary policy. We simply lack a basis on which to make an informed judgment about "Congressional intent" in this area.

■ Thus, we confront a choice between attempting to "second guess" Congress on a political and philosophical issue and relying on the broad, unequivocal language of the statute. Inasmuch as we cannot adopt the first course without impinging on the legislative function, we feel constrained to pursue the latter. Accordingly, we decline to carve out an exception to the plain language of Section 2(3) of the Act.

In this context, we note that the present case differs significantly from *NLRB v. Bell Aerospace*, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). There, after a detailed examination of the Act's pre- and post-enactment history, the Supreme Court held that "managerial employees" belong to a class "so clearly outside the Act that no specific exclusionary provision was thought necessary." *Id.* at 283, 94 S.Ct. at 1766. The *Bell Aerospace* Court had the benefit of an extensive legislative history which permitted it to assess Congress' intent with some confidence. No such insight into Congress' position on the present issue is available to us.

Our second objection to the Association's argument lies in its apparent assumption that the primary, overriding concern of all sheltered workshops is to provide the handicapped with "therapy" and "rehabilitation." Even if we were willing to impute to Congress the Association's theory that collective bargaining has no place in a therapeutic environment, we would have reservations about inferring a blanket exemption from the Act for all sheltered workshops. Although all sheltered workshops presumably have some connection with programs geared to providing social services, the evidence in this and other cases strongly suggests that this "rehabilitative" and "therapeutic" nexus is, in some instances, subordinated to routine business considerations. Thus, even if Congress intended to exempt all *primarily* therapeutic institutions from the Act, some sheltered workshops would fail to qualify.

In practice, the Board has apparently adopted a policy based on this very distinction. It examines workshop operations on a case by case basis and determines whether the guiding principle of each is "rehabilitative" or typically industrial. In its discretion, it then exempts those which fit the former description and asserts jurisdiction over those which display significant economic purposes. *Compare, Goodwill Industries of Southern California*, 231 N.L.R.B. 536 (1977), and *Goodwill Industries of Philadelphia*, N.L.R.B. (1978); with *Chicago*

---

Wagner-O'Day Act permits the federal government to purchase goods produced at workshops on a non-competitive basis. The Rehabilitation Act of 1973 entitles sheltered workshops to financial assistance for certain programs which offer vocational rehabilitation services to handicapped persons.

*Lighthouse For the Blind,* 225 N.L.R.B. 249 (1976), *Lighthouse for the Blind of Houston,* 244 N.L.R.B. 1144 (1979), *enforcement denied,* 653 F.2d 206 (5th Cir. 1981), and the present case. Thus, under present Board practice, workshops which are truly primarily oriented toward providing social services need not fear any potential adverse impact collective bargaining might have on their programs. On the other hand, workers at workshops which closely resemble traditional, for-profit business enterprises enjoy the same legal protections as their counterparts in private industry.

Congress, of course, is free to alter this system of case by case adjudication at any time; and in any manner it sees fit. That it has not yet done so suggests that it is satisfied with the present state of affairs.

█ Having determined that sheltered workshop workers are not, as a matter of law, excluded from the Act, we must decide if the Board had an adequate factual basis for characterizing these particular workers as "employees."

*NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), established that the Board enjoys wide discretion in determining an individual or group's "employee" status. As a corollary to this discretion, Board decisions in this area are subject to limited judicial review. "[I]n reviewing the Board's ultimate conclusions, it is not the court's function to substitute its own inferences of fact for the Board's ... [T]he Board's determination that specified persons are 'employees' under the Act is to be accepted if it has 'warrant in the record' and a reasonable basis in law." *Id.* at 131, 64 S.Ct. at 860, *see also Bayside Enterprises v. NLRB,* 429 U.S. 298, 304, 97 S.Ct. 576, 581, 50 L.Ed.2d 494 (1977); *Physicians National House Staff Assn. v. Fanning,* 642 F.2d 492 (D.C.Cir.1980), *cert. denied,* 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981).

Given this standard of judicial review, we have no difficulty upholding the factual inferences which led to the Board's conclusion that these handicapped workers are "employees" under the Act. The Appel-

lant's arguments on this question are variations on a single theme—that the relationship between Workshop and workers differs in certain respects from the norm associated with private industry and that the blind workers are therefore not "true" employees. Our review of the record, however, indicates that the Board took into account the special characteristics of sheltered workshops but remained unpersuaded that these particular handicapped workers were thereby transformed into something other than statutory "employees." The Charging Parties below documented in detail the extent to which the blind workers operate under terms and conditions typical of "employment." The Board, in its discretion, apparently concluded that the similarities between these workers and their counterparts in private industry outweighed the differences. On the present record, we are unprepared to require the Board to shift its emphasis and reach a contrary result.

█ We now consider the Association's alternative contention that even if its workers are statutory "employees", the Board should have declined to assert jurisdiction in this matter. In support of its argument that the exercise of jurisdiction here "would not effectuate the purposes of the Act", the Association again advances the theory that "rehabilitation" and collective bargaining are antagonistic concepts. In particular, it directs our attention to the Board's decision in *Goodwill Industries of Southern California, supra.* There, the Board did in fact decline jurisdiction over disabled workers on the premise that collective bargaining would disrupt the rehabilitative relationship between employer and employee. The Association contends that *Southern California* and the present case are indistinguishable on their facts and asks us to reverse the Board for failure to treat similarly situated persons in the same manner.

Once again, the Association has entered an area of Board discretion which is subject to limited judicial review, *Glen Manor Home for the Jewish Aged v. NLRB,* 474 F.2d 1145 (6th Cir. 1973); *NLRB v. Austin Developmental Center,* 606 F.2d 785 (7th

Cir. 1979).[2] The Board's decision at the representation stage of these proceedings reveals that the result in this case was based on a finding of fact that economic motives prevail at the Cincinnati Workshop despite the Association's professed "therapeutic" orientation. "The Employer's direction of the workshop is significantly based on economic considerations . . . Normal economic considerations are a significant factor in the Employer-"client" relationship. The Employer's relations with workshop "clients" and the employment conditions existing at the workshop are guided to a great extent by business considerations." 235 N.L.R.B. at 1449. On the present record, we cannot say that the Board's conclusion was an abuse of discretion.

Furthermore, although the Board's decision below is not as detailed as we might like, we believe it does adequately distinguish the facts of the present case from those of *Southern California, supra.* In the first place, the Board emphasized in *Southern California* that its decision did not stand for the proposition that it would decline jurisdiction in all cases involving sheltered workshops. It referred to that case as the "rare, possibly nonrecurring instance where an employer's concern for the welfare of his employees competes with, and in some sense displaces, the union's ordinary concern for employee well-being." 231 N.L.R.B. at 537.

Second, in *Southern California,* Goodwill Industries reserved fifty percent of its job openings for the short-term training of workers who soon moved on to find employment in the competitive market. Thus, in a very real sense, Goodwill operated a rehabilitative vocational clinic; it had on its staff a full-time job placement specialist to help trainees find permanent employment

elsewhere. By contrast, the Association's workshop offers long-term employment with little emphasis on the acquisition of skills other than those required for Workshop production.

At Goodwill, counseling and other social services were an integral part of a worker's relationship with the employer. As the Board observed, "Goodwill's work program, and the production associated with it, was one element of the rehabilitation plan, not an enterprise in itself." 355 N.L.R.B. at 1448. On the other hand, workers at the Cincinnati workshop who wish to obtain social services must seek them in the same manner as other blind members of the community.

In short, we agree with the Board that the circumstances of the *Southern California* case differ materially from the situation at the Cincinnati workshop. We therefore reject the Association's contention that the Board's action constituted an abuse of discretion.

■ Finally, in a separate issue, the Association challenges the Board's certification of a bargaining unit which includes both sighted and handicapped employees. It cites as the basis for its objection certain differences in the Workshop's disciplinary policy toward blind and sighted workers, the piecework versus hourly rate wage structure of the two groups, and the sighted workers' participation in the Association's pension plan. The Board, however, found these minor differences insufficient to affect the "appropriateness" of a bargaining unit in which all employees work closely together and serve interdependent functions. We agree, and decline to disturb this exercise of the Board's discretion. *See Michigan Hospital Service Corp. v. NLRB,*

---

2. Generally, when the courts speak of the Board's "discretionary jurisdiction", the question under consideration is whether an employer's activities have sufficient impact on commerce to warrant the exercise of jurisdiction. *See* 29 U.S.C. § 164(c). In this case the Association does not pursue a "commerce issue." As a matter of legal nicety, it might be preferable to subsume this discussion under the heading of the Board's determination of statutory

"employee" coverage. However, throughout this proceeding, the parties and the Board alike have referred to the Board's action below as the assertion of "discretionary jurisdiction." Inasmuch as the same standard of judicial review applies regardless of the way we frame the issue, we have, for purposes of clarity, attempted to "track" the presentation adopted by the parties and the Board.

472 F.2d 293 (6th Cir. 1972); *NLRB v. Southern Metal Service*, 606 F.2d 512 (5th Cir. 1979).

In concluding our discussion of this case, we note that we are aware of the Fifth Circuit's recent refusal to grant enforcement of the Board's orders in *NLRB v. Lighthouse for the Blind of Houston*, 653 F.2d 206 (5th Cir. 1981). Although our information about the facts underlying that case is incomplete, our decision today appears to create a conflict in the law between the Fifth and Sixth Circuits. In this context, suffice it to say that we do not depart lightly from the principle of uniformity in the federal court system; on the contrary, we have reached our present conclusion only after lengthy deliberation on the respective functions of Congress, the Board, and federal Courts of Appeal.

Enforcement granted.