**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LIGHTHOUSE FOR THE BLIND OF HOUSTON, Respondent.**

No. 80–1753.

United States Court of Appeals, Fifth Circuit.

Jan. 31, 1983.

Rehearing and Rehearing En Banc Denied March 21, 1983.

Elliott Moore, Deputy Assoc. Gen. Counsel, Sandra Williams, David Fleischer, N.L. R.B., Washington, D.C., for petitioner.

Donald S. Shire, Associate Sol., Barbara E. Kahl, U.S. Dept. of Labor, Washington, D.C., amicus curiae, Secretary of Labor.

Eric H. Nelson, Houston, Tex., for intervenor Teamsters Local No. 968.

Liddell, Sapp, Zivley, Brown & Laboon, W. Robert Brown, Douglas R. Little, Houston, Tex., for respondent.

Bert N. Bisgyer, Washington, D.C., amicus curiae for Nat. Federation of the Blind.

Before GARZA, TATE and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge.

In this case, before us now on rehearing, the National Labor Relations Board seeks enforcement of its order of April 24, 1980, 248 N.L.R.B. 1366 (1980), that the Lighthouse for the Blind of Houston ("Lighthouse") recognize and bargain with the General Drivers, Warehousemen and Helpers Local Union 968, of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Union"), which had been certified as the exclusive bargaining representative of a production and maintenance unit of employees in the Lighthouse's Workshop A. The Board found that the Lighthouse had violated Section 8(a)(1) and (5) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1), (5), by refusing to recognize the Union and by refusing to furnish the Union relevant wage and employment information concerning such employees. In an opinion of August 10, 1981, 653 F.2d 206 (5th Cir.1981), another panel of this Court denied enforcement of the Board's order, finding that the Board improperly asserted jurisdiction over the Lighthouse "employees" of Workshop A because those workers were "clients" whose relationship with the Lighthouse was rehabilitative rather than typically industrial. This opinion was subsequently vacated, 679 F.2d 379 (5th Cir. 1982), and the case reargued. On rehearing, we find that the Board's determination that the commercial and business nature of the workers' employment predominated over any rehabilitative goals was supported by substantial evidence in the record as a whole. It follows that the Board correctly concluded that these workers were entitled to organize and bargain collectively within the meaning of the Act, 29 U.S.C. § 152(3). We grant enforcement of the Board's order.

## I.

The Lighthouse is a nonprofit, charitable corporation [1] which provides services to and carries on programs for individuals with visual impairments. Part of its activities include operating the workshop involved in this case. The Lighthouse's activities are divided into five departments: social services,[2] volunteer services,[3] library and special services,[4] rehabilitation [5] and industrial. The first four departments provide services which are available to all blind persons in the Houston community.[6] These departments receive state, federal and private

---

1. A 35-member board of directors presides over and directs its operation. No member of the board of directors receives compensation for his services. The largest single group of board members are former volunteers, who had served at the Lighthouse over the past 20 years. The rest of the board members come from a cross section of the business and civic community of Houston.

2. The social services division provides social work and recreational services both at the facility and at the individual's residence to assist blind persons.

3. The volunteer services division provides volunteers to support the various operations of the Lighthouse.

4. The Lighthouse has a library and special services division, which makes braille, large print and talking books available for the unsighted and visually impaired community.

5. The rehabilitation division offers vocational training which is geared toward helping visually impaired persons adapt to their environment.

6. Similar Lighthouses exist throughout the country, providing like services to their respective communities.

funding to support their operations.[7] They are also supported, in part, by the profits generated by the fifth department, the Industrial Division.[8]

The Industrial Division consists of two diverse "workshops": Workshop A, whose employees are the subject of the immediate dispute, and Workshop B.[9] Workshop B includes approximately 30 individuals who are severely handicapped in addition to being blind and who are not engaged in substantial production work for sale. These individuals, who are unable to be fully productive, are paid at least fifty percent of the statutory minimum wage and fall under the sheltered workshop certificate which the Lighthouse has received from the Department of Labor.[10] Some individuals in Workshop B, after training and rehabilitation, "graduate" to Workshop A.

Workshop A employs approximately 70 individuals, 90 percent of whom are legally blind and, in some cases, are also afflicted with other handicaps. Sighted workers, who may or may not be otherwise handicapped, perform maintenance work on the machines and equipment used in Workshop A. Workshop A, which is housed in a separate building at the Lighthouse, performs a variety of manufacturing functions including the production of felt-tipped pens, mops, and brushes, the bottling of disinfectants and detergents,[11] and the performance of subcontract work for private employers.[12] The Industrial Division is also involved in the distribution, for retail sale, of

7. For example, in 1977, the year for which data was considered by the NLRB, the Rehabilitation Division received $195,000 and $122,000 in state and program service fees and federal grants, respectively. In that year the Lighthouse also received $135,000 to $140,000 from the Houston, Harris and Fort Bend Counties United Way for "Health and Rehabilitation Services."

8. The Industrial Division sales in 1977 generated revenues of $4,620,000, netting a profit of some $237,000. This represented the fourth consecutive year in which Industrial Division operations had shown a profit. The Division's revenues accounted for approximately 90% of total Lighthouse revenues in the year in question.

   The Industrial Division, unlike the other departments, is self-supporting. It does not receive the federal or state grants channeled elsewhere within the Lighthouse.

9. Workshop B was excluded from the "appropriate unit" by agreement of the parties. Its status is not at issue in this case.

10. The Fair Labor Standards Act, 29 U.S.C. § 214(c), seeks to encourage employment opportunities for handicapped workers by permitting "sheltered workshops" to pay wages lower than the prevailing minimum wage. As found by the Board, it cannot be determined whether the Lighthouse's sheltered workshop certificate applies to both Workshop A and Workshop B or merely to Workshop B.

11. In 1977, the Industrial Division assembled and sold 40,539,744 felt-tip pens, 250,000 mops and 300,000 brushes, and packaged and sold 145,000 gallons of disinfectant and 30,000 gallons of liquid detergent, which had been pur-

chased in bulk, largely to the federal government pursuant to the Wagner O'Day Act, 41 U.S.C. §§ 46–48. Under the Act, the President's Committee For Purchase From the Blind and Other Severely Handicapped determines which products the federal government will purchase, on a nonbidding basis, from workshops for the blind pursuant to an evaluation of whether a given product can be produced by workshops at a fair market price that is competitive with that which private industry would command. The principal workshop qualification requirement is that 75% of the direct labor production on the contract must be performed by legally blind individuals.

The National Industries for the Blind (NIB), a private, nonprofit corporation, which appeared as *amicus curiae* in the immediate case, consults with the President's Committee on both the development of products and the establishment of the pricing structure under the Act. The NIB will also work with any workshop, in an advisory capacity, to assist in the development of its production capabilities. For its services, the NIB receives a 4% commission from the assisted workshop on all sales after the first year of production of the new product. NIB products carry the trademark "Skillcraft" and are not limited to sale to the federal government. At the Lighthouse, while most of the "Skillcraft" pens are sold to the federal government, some are sold in approximately 60 Houston, Texas convenience stores.

12. As evidenced at the hearing before the NLRB, examples of subcontract work performed for a diverse array of private companies include: the performance of "grease check assembly work"; collating materials and otherwise filling notebook binders with various inserts; counting and packaging medicine bottle caps; packaging information; and assembling fishing rod holders.

various non-manufactured products purchased in bulk from other workshops both inside and outside Texas.[13]

Workshop A employees are all paid at least the federal minimum wage for their work. Variations above the minimum wage reflect differing levels of productivity.[14] All Workshop A employees, however, are required to meet a productivity standard, measured by the norm of sighted individuals performing comparable duties in competitive private industry. Employees who cannot meet these standards may be transferred to Workshop B. If productivity levels above these standards are maintained, individuals may receive merit increases above their hourly rate; if these increased levels are not sustained, the raises may be withdrawn.

Workshop A employees are covered by worker's compensation, unemployment insurance, and hospitalization insurance, and receive pension rights and nine paid holidays per year. They also receive other benefits which vary according to tenure, including vacation and sick leave.

The employees work under production deadlines, and are compensated at time-and-one-half for overtime work. Employees are disciplined for, among other things, low production, improper job performance, excessive tardiness or absenteeism, and insubordination. Progressive discipline is employed, and terminations have been an infrequent result.[15] The disciplinary procedure moves from counseling to managerial discussion.[16] Failing these successive measures, a workers' committee [17] considers the matter and can authorize disciplinary measures be taken, including suspension and termination.[18] The supervisors in Workshop A are, generally, former workers who have frontline responsibility to ensure that production needs are met, including responsibility to check time cards, to dock workers who are late, and to approve requests to leave work early or to not come in on a particular day.[19]

The Lighthouse has no formal program for placement of Workshop A employees, although some individuals are placed in private industry on an ad hoc basis. Over the years, approximately three to four individuals have been placed annually; approximately half of these workers subsequently return to work at the Lighthouse. A large proportion of the employee complement of Workshop A has worked at the Lighthouse for at least ten years and some for as many as twenty years.[20]

13. Examples of these items include: plumber's helpers, i.e., plungers; squeegee-type materials; dust pans; plastic brooms; mop handles; bug pads to clean windshields; and feather dusters. The Lighthouse resells the brooms, for example, to essentially the same aggregate of retailers who purchase its mops. These brooms, which accounted for 5 to 10% of the 1977 Lighthouse revenues, are displayed and sold in competition with brooms manufactured and distributed by private sector companies.

14. At the time of the representation hearing, wages ranged from $2.89 to $3.25 or $3.40 per hour.

15. Three terminations, over the preceding four years, were evidenced in the record before the NLRB. Suspensions, without pay, are more frequently imposed as discipline, for example, when employees fail to perform their tasks properly.
   Employee performance is regularly evaluated by supervisors and by the Workshop manager at least once and usually twice a year.

16. Workers may be transferred to other departments within Workshop A, in an effort to correct any perceived problems.

17. The workers' committee is composed of employees from each industrial department, on the basis of annual elections.

18. While the committee is typically involved in the most serious matters of employee discipline, to date there has been no instance where it has not gone along with the discipline management sought to impose.

19. The supervisors were excluded from the NLRB's bargaining unit determination, and the parties have not appealed that determination of supervisory status under the Act.

20. New employees at Workshop A are comprised of walk-in applicants, referrals and Workshop B graduates. At the time of the hearing, all those seeking employment who could meet the production standards were provided jobs at Workshop A.

## II.

At issue is the propriety of the Board's application of the National Labor Relations Act to Workshop A "employees."[21] The NLRA, apart from providing explicit exclusions, none of which are herein applicable, offers little definition as to who are "employees" covered by the Act.[22] The Board, in considering the basic policies behind the Act, has wide discretion in adding flesh to the bare-bones definition of "employee" while determining the status of individuals whose statutory coverage is at issue. *NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). As a result, it is well established that our function on review is quite limited:

> [I]n reviewing the Board's ultimate conclusions, it is not the court's function to substitute its own inferences of fact for the Board's... [T]he Board's determination that specified persons are "employees" under the Act is to be accepted if it has "warrant in the record" and a reasonable basis in law.

*Id.* at 130–31, 64 S.Ct. at 860–61. *See Bayside Enterprises, Inc. v. NLRB,* 429 U.S. 298, 304, 97 S.Ct. 576, 581, 50 L.Ed.2d 494 (1977). *Accord, Cincinnati Association for the Blind v. NLRB,* 672 F.2d 567, 572 (6th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982); *Physicians National House Staff Association v. Fanning,* 642 F.2d 492 (D.C.Cir.1980), *cert. denied,* 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981). With this circumscribed standard of review, we turn to examine the Board's determination that Lighthouse A workers fall within the Act's purview as "employees."

Our review of the recent Board decisions reveals that the Board's exertion of jurisdiction over workshops has hinged upon an ad hoc determination of whether the essential nature of the workshop is "rehabilitative" or "typically industrial." *Compare Goodwill Industries of Southern California,* 231 N.L.R.B. 536 (1977) (jurisdiction declined), *with Chicago Lighthouse for the Blind,* 225 N.L.R.B. 249 (1976) (jurisdiction asserted) *and Cincinnati Association for the Blind,* 235 N.L.R.B. 1448 (1978) (jurisdiction asserted). It exempts those which serve a primarily rehabilitative or therapeutic function and asserts jurisdiction over those wherein business or economic characteristics predominate. In the immediate case, the Board concluded that Workshop A exhibited business and commercial over therapeutic traits.

The Lighthouse contends that in reaching this conclusion, the Board erred. It points to various aspects of Lighthouse "employment" in support of its position that Work-

---

**21.** The mere fact that the Lighthouse is a nonprofit, charitable institution does not divest the Board of jurisdiction under the Act. The Board possesses "the fullest *jurisdictional* breadth constitutionally permissible under the Commerce Clause." *NLRB v. Reliance Fuel Oil Corp.,* 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963) (emphasis in original); 29 U.S.C. § 160(a). While a greater proportion of nonprofit, charitable entities may not "affect commerce" than would that of profit-making enterprises, any such observation has no bearing on the specific case before us. The Lighthouse is engaged in extensive commercial activity, which more than amply supports the Board's exertion of jurisdiction. *Cf. NLRB v. Yeshiva University,* 444 U.S. 672, 681 n. 11, 100 S.Ct. 856, 862, n. 11, 63 L.Ed.2d 115 (1980) ("Congress appears to have agreed that nonprofit institutions 'affect commerce' under modern economic conditions"). Further, nothing in the statutes affecting the Lighthouse as a sheltered workshop, or in their legislative history, leads us to conclude that Congress intended to exclude sheltered workshops, such as the Lighthouse, *per se* from the National Labor Relations Act. *See* Fair Labor Standards Act, 29 U.S.C. § 214(c); The Wagner O'Day Act, 41 U.S.C. §§ 46–48; and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* We agree with the Sixth Circuit's conclusion that Congress has not indicated a "belief in the fundamental incompatibility of collective bargaining and any form of 'therapy.'" *Cincinnati Association for the Blind v. NLRB,* 672 F.2d 567, 570–72 (6th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982). The sole issues before us, therefore, revolve around the question of whether the Board properly characterized the Lighthouse Workshop A workers as employees under the NLRA, and no exception in the statutes is applicable to this employer/employee relationship.

**22.** Section 2(3) merely provides that the "term 'employee' shall include any employee ... unless this subsection explicitly states otherwise." 29 U.S.C. § 152(3).

shop A's focus is upon rehabilitation, that the Workshop is not engaged in a typically industrial endeavor, and, consequently, that NLRA collective bargaining rights are incompatible with rehabilitation. In particular, the Lighthouse stresses: 1) the rehabilitation, counseling and other services offered the blind at its facilities; 2) the hiring practice, which offers employment to all who request it in accordance with handicap rather than "traditional" employment criteria; 3) the disciplinary practice and procedure, which emphasizes counseling, peer-committee evaluation, and skill accommodation, and which seldom results in traditional industrial discipline; and 4) the placement of Workshop employees in private industry.

■ These asserted differences, however, do not persuade us that the Board abused its discretion in exerting jurisdiction. In assessing whether substantial evidence in the record as a whole supports the Board's finding, we note that while, to some extent, Workshop A employment might differ from "typical industrial" employment, the record does not reveal these differences to be as marked as the Lighthouse paints them to be. The rehabilitative, counseling and other social services exist for the community as a whole. Workshop A employees avail themselves of these services, as members of the handicapped community, rather than as Lighthouse workers; they may only seek these services, however conveniently located, outside of working hours as may any handicapped individual. Although over half of Workshop A employees receive "work adjustment training" before beginning their employment, the record is clear that this training period is uncompensated, and that the participating individuals are neither considered to be part of Workshop A while in training nor included in the unit certified by the Board.

While the hiring practice may well provide employment to all visually handicapped job-seekers, thus providing opportunities in accordance with criteria and procedures at variance with the private sector

norm, other Lighthouse practices mitigate these differences. It is undisputed that once employed in Workshop A the handicapped must be able to meet the same production standards as would sighted individuals. If these standards cannot be met, Workshop A employees are subject to discipline or "demotion" to Workshop B. Thus, while the Lighthouse may well be able to afford all blind workers a chance at remunerative employment—both to a degree and demonstrating a policy foreign to the general business community—continued Workshop A employment is contingent upon typical business criteria.

Similarly, while discipline at the Workshop might be both more counseling-oriented and less frequently meted out than in the profit-making sector, it is undisputed that the severest forms of discipline have been invoked for industrial infractions.[23] We also note that the counseling-skills accommodation-work committee procedure is not wholly unique to the Lighthouse as a sheltered workshop; analogous provisions for managerial discussion and grievance procedures are well-known to the profit-making sector.

Finally, the record shows that the placement efforts of the Lighthouse have been informal, ad hoc, and not all too successful. No placement staff or program exists; movement into industry occurs sporadically as the Lighthouse is informed of available positions; over half of the approximately three to four individuals placed each year return to Workshop A; and many individuals are employed at Workshop A for as many as 10 to 15 years, with some there for as long as 20 years.

In essence, then, the differences stressed by the Lighthouse in an effort to show the Board's error, do not carry their purported weight once the record is examined. When so examined, the nature of Workshop A employment is distinguishable from that of the sheltered workshop in *Goodwill Industries of Southern California,* 231 N.L.R.B. 536 (1977), over which the Board declined

**23.** *See* discussion *infra* at notes 15–16.

jurisdiction. In *Goodwill Industries* the Board found that "rehabilitation" activities and goals permeated the "employer-client" relationship, that productivity did not affect remuneration or tenure, that discipline was rarely invoked, that fifty percent of job openings were reserved for short-term training of individuals who would shortly move into the open market, and that a formal, full-time placement program existed. On the basis of these findings, as well as others, the Board concluded that in this "unusual employer-client relationship," where the employer's "primary objectives are the converse of a normal employer's objectives—so much so that Goodwill might better be classified as a vocational clinic than as a viable entrepreneural concern," "[t]o permit collective bargaining in this context is to risk a harmful intrusion on the rehabilitative process...." 231 N.L.R.B. at 537. We cannot find, on the basis of the record before us, that the Board erred in distinguishing the case at hand from *Goodwill Industries. And compare NLRB v. Deaton, Inc.,* 502 F.2d 1221, 1228 (5th Cir.), *cert. denied,* 422 U.S. 1047, 95 S.Ct. 2665, 45 L.Ed.2d 700 (1975) ("Even if subsequent cases reaching the opposite result are truly indistinguishable, it is not our province to ensure an abstract and academic consistency in Board decisions.").

Having shown that the asserted differences from the industrial norm are not as great as claimed, we now turn our attention to uncontroverted evidence before the Board which shows unmistakably that Workshop A employees work under "commercial and business" conditions. The employees are compensated at or above the minimum wage. Merit increases are considered and given. Employees are disciplined for low productivity or other violations of rules and requirements of the workplace. The disciplinary procedures constitute in practical effect an employer imposed grievance procedure. The employees punch time clocks. They work under production deadlines and work the traditional forty hour workweek with time and a

half for overtime as the Fair Labor Standards Act provides. They have a schedule of holidays. They accrue pension, vacation, medical, and unemployment benefits. Some of these benefits are based upon seniority. For many persons, Workshop A is a permanent employer as both the workers' long tenure and low out-placement levels attest. The workshop operates at a fairly substantial profit and is not supported by public or private funds. Its extensive production and marketing activities further emphasize the nature of the working conditions and working environment of the Workshop A employees. These working conditions and this working environment are in dominant measure typical of working conditions and a working environment subject to collective bargaining under the National Labor Relations Act, if the employees choose to bargain collectively. The panoply of working conditions and benefits which the Lighthouse has paternalistically given to Workshop A employees are the normal and usual grist for the mill of collective bargaining.

The above business and commercial characteristics of Workshop A employment lead us to conclude that the Board could properly find the individuals working therein to be "employees" within the meaning of the Act. The approach taken and the conclusion reached by the Board in this case is entirely consistent with the Board conclusion in *Cincinnati Association for the Blind,* 235 N.L.R.B. 1448 (1978), *enforced* 672 F.2d 567 (6th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982). In *Cincinnati,* the Board distinguished its decision to decline jurisdiction in *Goodwill Industries of Southern California,* 231 N.L.R.B. 536 (1977), finding that the *Cincinnati* "workshop operation [was] significantly based on economic considerations" while "the single overriding purpose of the 'employer-client' relationship [in *Goodwill*] was rehabilitation." In so concluding, the Board emphasized the same operational, productivity, compensation and marketing factors considered in the immediate case.[24] We can

---

**24.** If anything, the facts of the immediate case more strongly indicate an economic orientation than do those of the *Cincinnati* case. For example, the profit generated by the Cincinnati

find no error in the Board's determination that the factors present in the immediate case followed the *Cincinnati* "economic," rather than the *Goodwill* "therapeutic," pattern.

■ The Board has determined that application of the Act to workers in workshops such as the Lighthouse, which exhibit "typically industrial," over "rehabilitative," characteristics, is entirely consistent with the statutory purpose. We find that such a determination has a "reasonable basis in law." *NLRB v. Hearst Publications, Inc., supra,* 322 U.S. at 131, 64 S.Ct. at 861. There is no Congressional policy that collective bargaining is totally inconsistent with rehabilitative activity.[25] We properly decline to impose such a theory upon the Board.[26]

■ We find the National Labor Relations Board's exercise of jurisdiction over Workshop A of the Houston Lighthouse for the Blind to be within its statutory power. The certification of an appropriate bargaining unit has been made, and a valid election held. The order of the NLRB directing the Lighthouse to cease and desist from refusing to bargain with the selected union bargaining representative in violation of 29 U.S.C. § 158(a)(1) and (5) is

ENFORCED.

---

workshop, for the 1976-year under examination, was $144,000, to be compared with the $237,000 figure in the present case.

**25.** The Secretary of Labor, as *amicus curiae,* appeared in this case to express the view that the general objectives and certification system of Fair Labor Standard's Act sheltered workshop provisions would not be affected by the NLRB's jurisdictional determination. As such, the Secretary's view was that this Court need only concern itself with the NLRA's provisions.

**26.** As stated by the Supreme Court, in *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 266–67, 95 S.Ct. 959, 968–69, 43 L.Ed.2d 171 (1975), in addressing the paramount role played by the Board in interpreting the Act:

The responsibility to adapt the Act to changing patterns of industrial life is entrusted to the Board. The Court of Appeals impermissibly encroached upon the Board's function in determining for itself that an employee has no "need" for [an asserted

right].... It is the province of the Board, not the courts, to determine whether or not the "need" exists in light of changing industrial practices and the Board's cumulative experience in dealing with labor-management relations. For the Board has the "special function of applying the general provisions of the Act to the complexities of industrial life," ... and its special competence in this field is the justification for the deference accorded its determination.... Reviewing courts are of course not "to stand aside and rubber stamp" Board determinations that run contrary to the language or tenor of the Act.... But the Board's construction here, while it may not be required by the Act, is at least permissible under it, and insofar as the Board's application of that meaning engages in the "difficult and delicate responsibility" of reconciling conflicting interests of labor and management, the balance struck by the Board is "subject to the limited judicial review."