ARKANSAS LIGHTHOUSE FOR THE BLIND, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 87–2099.

United States Court of Appeals, Eighth Circuit.

Submitted April 13, 1988.

Decided June 27, 1988.

Rehearing and Rehearing En Banc Denied Aug. 16, 1988.

Gerladn P. Patten, Little Rock, Ark., for petitioner.

William R. Stewart, Washington, D.C., for respondent.

Before BOWMAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and HANSON *, Senior District Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

This case comes before us on the petition of the Arkansas Lighthouse for the Blind (Lighthouse) for review of the decision and order of the National Labor Relations Board and on the Board's cross-application for enforcement. The Board in a split decision (Chairman Dotson, dissenting) found that the Lighthouse had violated the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* and ordered it to: 1) cease and desist from engaging in unfair labor practices; 2) retroactively compensate its employees for an illegally withheld wage increase; and 3) bargain with the Teamsters Union. Because we hold that the Board erred when it exercised jurisdiction in this case, enforcement is denied.

## I. BACKGROUND

The Lighthouse is a nonprofit, charitable corporation [1] engaged primarily in the manufacture of products such as notebooks, pillowcases, mattress covers, gun belts, and helmet liners. Over ninety percent of its products are sold to the federal government pursuant to the Wagner–O'Day Act, 41 U.S.C. §§ 46–48, which requires that seventy-five percent of the man hours necessary for production be performed by blind people. The Lighthouse employs fifty-four persons, eighty-four percent of whom are blind. It operates under a sheltered workshop certificate issued by the Department of Labor and thus may pay wages as low as fifty percent of the minimum wage. [2] Nevertheless, the Lighthouse pays all of its employees identical hourly wages in excess of the minimum wage and increases the wage yearly.

Approximately ninety-eight percent of the Lighthouse's employees are referred from the state Office of the Blind and Visually Impaired (OBVI). New employees undergo a thirty-day training period and are retained thereafter if minimum production requirements are satisfied. Employee production ranges from under fifty percent to nearly eighty percent of what a sighted person would produce.

Employees are disciplined for serious misconduct, and one employee was fired for threatening a supervisor with a knife. The employee manual states that employees will be disciplined for, among other things, stealing, destroying property, using profane language, fighting, falsifying timecards, intoxication, and gambling.

The ultimate goal of the Lighthouse is to place its employees in private industry. Its annual reports show that five placements were made in 1977–78, eight in 1978–79, and seven in 1979–80.

On April 20, 1981 five Lighthouse employees met with representatives of the Chauffeurs, Teamsters, and Helpers Union. The Union obtained authorization cards from forty-four of the fifty-four employees and an election was scheduled for July 10. The Lighthouse responded with a series of

---

* The HONORABLE WILLIAM C. HANSON, United States Senior District Judge for the Southern District of Iowa, sitting by designation.

1. The Lighthouse is a tax exempt institution under the Internal Revenue Code, 26 U.S.C. § 501(c)(3) (1982).

2. The wages, however must be "commensurate with those paid non-handicapped workers in industry in the vicinity for essentially the same type, quality, and quantity of work." 29 U.S.C. § 214(c)(1).

actions aimed at defeating the Union including threatening plant closure if the Union won the election and withholding a scheduled wage increase pending the outcome of the election. The Union lost the election by a vote of twenty-eight to twenty-four and then filed a charge with the Board contending that the Lighthouse had committed unfair labor practices. The Board found several violations and ordered the Lighthouse to bargain with the Union.

## II. DISCUSSION

The dispositive issue in this case is whether the Board abused its discretion when it held that the Lighthouse workers are "employees" within the meaning of the National Labor Relations Act. Because we believe the Board erred, we need not address the other issues raised.

The National Labor Relations Act vests the Board with jurisdiction to "prevent any person from engaging in any unfair labor practice * * * affecting commerce." 29 U.S.C. § 160(a). By this language "Congress intended to and did vest in the Board the fullest *jurisdictional* breadth constitutionally permissible under the Commerce Clause." *NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963) (emphasis in original). As long as the effect on commerce is more than *de minimus* the Board may exercise jurisdiction. *NLRB v. Fainblatt*, 306 U.S. 601, 607, 59 S.Ct. 668, 672, 83 L.Ed. 1014 (1939). Because the Lighthouse admitted that during a representative period it had annual sales in excess of $500,000 and shipped goods valued in excess of $50,000 to points outside the state, we have no problem holding that the Lighthouse affects commerce. *See NLRB v. St. Louis Christian Home*, 663 F.2d 60, 63 (8th Cir. 1981) ($16,000 paid for telephone service and electricty to companies engaged in interstate commerce was sufficient to confer jurisdiction on Board).

This does not end our inquiry, however, because the statutory jurisdiction of the Board is further limited by the definition of the term "employee." Although the Act defines employee very broadly the Board has subdivided the term into two groups: The first group encompasses workers whose employment is rehabilitative or therapeutic. In the second group are those whose employment is primarily industrial. *See Cincinnati Ass'n for the Blind v. NLRB*, 672 F.2d 567, 571–72 (6th Cir.), *cert. denied*, 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed. 2d 75 (1982). The Board will exercise jurisdiction over disputes involving the latter, but not the former on the theory that "workshops which are truly primarily oriented toward providing social services need not fear any potential adverse impact collective bargaining might have on their programs. * * * [whereas] workers at workshops which closely resemble traditional, for-profit business enterprises enjoy the same legal protections as their counterparts in private industry." *Id.* at 572. It is with this dichotomy in mind that we begin our analysis.

We believe that the Board has taken a much too restrictive view of what constitutes rehabilitation or therapy. For example, the Board found it most significant that the Lighthouse encourages its employees to increase production and transfers employees to other departments if their production is insufficient. The Board also noted that working conditions closely resemble those in private industry because employees work a full workweek, punch a time clock, and receive overtime compensation, health and life insurance, unemployment benefits, workers' compensation, nine paid holidays, and paid vacation time.

Further, the Board found it significant that the Lighthouse will discharge employees for serious misconduct and, in fact, did discharge one employee for threatening a supervisor with a knife. It also considered the fact that the Lighthouse does not provide social and counseling services for its employees and the blind community as a whole.

In addition to these factors which the Board determined supported its conclusion, it also considered, but discounted, those which it found support a contrary result. For example, the Board recognized that the Lighthouse does not make a profit, but

found it insignificant. "Whether an employer is concerned about making profits may be a relevant factor, but lack of profitability does not show that business considerations do not govern an employer's relationship with its employees," the Board stated. The Board also inferred a business motive from the fact that the Lighthouse has displaced sighted employees to create jobs for blind workers and has made other accomodations to keep blind workers employed. Finally, the Board found that the Lighthouse's attempts to place its employees in private industry were inadequate; "it does little more than meet the Department of Labor's requirement that it send OBVI an annual list of capable clients."

We believe that the Board's exercise of jurisdiction resulted from an erroneous view of what constitutes rehabilitation. The Board argues that the Lighthouse is not attempting to rehabilitate its employees because it provides no recreation area. We fail to see the significance of this. The Lighthouse's employees are blind adults who desire to learn job skills which will enable them to gain meaningful employment in private industry. They are not children who need recess. One need not coddle in order to rehabilitate. There may be no better preparation for work in private industry than time spent in a caring environment which in some respects parallels private industry. Work is an accepted form of rehabilitation. *See Key Opportunities, Inc.*, 265 NLRB 1371, 1374 (1982) ("Key's sole purpose is to provide work rehabilitation and work-based therapy to handicapped persons"). Work is probably the most productive and successful method of rehabilitation for handicapped persons who are able to work, and particularly the blind. Our society through its government recognizes this by aiding and assisting with the Wagner–O'Day Act, which fact a majority of the Board panel completely ignores. The Wagner–O'Day Act assists projects aiding the handicapped by providing a ready market and purchase of the productive efforts engendered by not-for-profit groups seeking to employ handicapped people. The Board's action and view of its majority adopts the opposite view of discouraging the formation and operation of non-profit projects to aid and assist therapeutic and rehabilitative efforts to employ the handicapped.

The usual employer-employee relationship in our competitive marketplace is not present in these good faith efforts to employ the handicapped nor is the Union's normal objective of securing improved working conditions for the employees either necessary or productive of that objective. As the Board itself stated in *Goodwill Industries of Southern California*, 231 NLRB 536, 537 (1977):

> The Union's normal objective—that of securing improved working conditions for the employees it represents—is here avowedly and convincingly embraced by the Employer itself—with, however, a difference in emphasis as to how that goal should be accomplished. To permit collective bargaining in this context is to risk a harmful intrusion on the rehabilitative process by the Union's bargaining demands. For example, if the Union demanded higher wages, this could well force the Employer to either reduce its client work force or hire more productive workers—thus compromising the Employer's rehabilitative efforts. Union demands for higher benefits for senior employees might tempt the Employer to reconsider its policy of keeping clients on as long as necessary. Conversely, union demands for unlimited employment tenure could prejudice the Employer's efforts to provide charitable employment to as many disabled people as possible. The collective-bargaining process, in short, is likely to distort the unique relationship between Employer and client and impair the Employer's ability to accomplish its salutary objectives.

By encouraging production[3] the Lighthouse provides an incentive for employees to increase their job skills. Similarly, re-

---

**3.** Although the Lighthouse has a production *goal* of eighty percent of what a sighted person would produce, only thirty-five to forty percent of its employees approach that figure. The remainder produce at less than the sixty percent level.

quiring employees to work full work weeks and punch a time clock, as well as providing unemployment benefits, workers' compensation, and paid holidays and vacations prepares the employees for the private sector by acclimating them to the conditions they will face outside the Lighthouse. Disciplining employees for gross misconduct in no way detracts from the rehabilitative atmosphere; as noted by Chairman Dotson, the disciplinary actions taken by the Lighthouse do not rise nearly to the level usually taken in private industry. *See Key Opportunities,* 265 NLRB at 1373 (employee discipline ranged from oral warning to discharge, but the workshop nevertheless was found to be rehabilitative rather than industrial).

We disagree with the Board that the Lighthouse's failure to make a profit is insignificant. While not a deciding factor, lack of profits certainly is a consideration.[4] *See id.* at 1374. The Lighthouse's lack of profits may be due to its practice of paying all employees an equal wage, regardless of productivity. In our view this practice alone goes a long way toward deciding the issue. Chairman Dotson also placed great weight on this factor:

> Wages geared to productivity and tenure are a hallmark characteristic of private employment and a means by which employers reward work performance. The absence of such a policy here, which is given insufficient weight by the majority, shows that the Respondent's relationship with its clients is not governed by economic considerations. (Footnote omitted).

*See also Goodwill Industries,* 231 NLRB at 537 (equal wages "are as much an instrument of the rehabilitative process as they are recompense for productive activity"). Further, we decline to infer a business motive from the fact that the Lighthouse has replaced sighted workers with blind persons and has adapted several jobs to accomodate blind workers. This is in keeping with the general purpose of aiding the blind. The Board found that these

actions could have been taken to comply with the Wagner–O'Day Act, rather than to serve a rehabilitative purpose. We refuse to infer such a business purpose, especially in light of all the other evidence of the Lighthouse's rehabilitative goals. In fact without federal assistance, it is doubtful that this Lighthouse could operate for any extended period. Finally, we can not say that the Lighthouse's attempts to place its employees in the private sector are inadequate simply because the Lighthouse "does little more than meet the Department of Labor's requirement that it send OBVI an annual list of capable clients." Although an in-house counselor undoubtedly would aid the overall placement effort, we can not say that compliance with the Department of Labor's requirements is per se insufficient. We agree with Chairman Dotson that the Lighthouse's rehabilitative object is not undermined by its unspectacular placement rate. Experience indicates that the private sector is not very anxious to hire blind workers.

We are aware that our decision today is at odds with the two circuit opinions primarily relied upon by the Board: *NLRB v. Lighthouse for the Blind,* 696 F.2d 399 (5th Cir.1983), and *Cincinnati Ass'n for the Blind v. NLRB,* 672 F.2d 567 (6th Cir.1982). The analysis used in these cases parallels that used by the Board and suffice it to say that our disagreement with the Board's interpretation of what constitutes rehabilitation extends to them as well.

This case does not involve a company which hopes to gain financially from selling the products its employees manufacture. To the contrary, any financial gain derived from sales to the federal government is incidental to the Lighthouse's goals. In fact, without federal assistance it is doubtful that this Lighthouse could operate for any extended period. In light of its $200,-000 loss in 1980 the Lighthouse "would be financially better off if its clients simply stayed home and [it] made no attempt to produce anything." *Key Opportunities,*

---

4. The Lighthouse lost approximately $200,000 in the year ending July 31, 1980 and would have lost substantially more had it not received over $90,000 in private contributions.

265 NLRB at 1374 (footnote omitted). Yet, the Lighthouse continues to operate because its goal is not to gain financially, but to help its employees by giving them a skill and a sense of self-worth. Granted, as the Board noted, the Lighthouse does not provide counseling on personal grooming, hygiene, and appropriate behavior as did the employer in *Key Opportunities*. But before we infer an industrial motive from the lack of counseling we must consider the handicaps involved. Many of the employees in *Key Opportunities* had severe emotional and mental problems. Their rehabilitation had to begin at a more elementary level. On the other hand, the Lighthouse employees are blind; there is no evidence that they need to be taught personal grooming, hygiene, or appropriate behavior. What constitutes rehabilitation necessarily depends on the handicap one seeks to overcome. As Chairman Dotson observed, the Lighthouse "simply has chosen to provide rehabilitation for its clients by emphasizing the development of work skills."

III. CONCLUSION

For the above reasons we believe that the Board clearly erred when it found that the Lighthouse employees are employees within the meaning of the National Labor Relations Act. The Lighthouse's objective is to rehabilitate its employees, not to financially benefit from them.[5]

Enforcement denied.

---

5. Our disposition of this case on jurisdictional grounds renders moot the Board's motion to strike portions of the Lighthouse's reply brief.

The disputed portions address facts relevant only to the unfair labor practices, and thus were not considered by this court.