NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

CHINATOWN PLANNING COUNCIL,
INC., Respondent.

No. 792, Docket 88–4152.

United States Court of Appeals,
Second Circuit.

Argued Feb. 23, 1989.

Decided May 19, 1989.

Robert N. Herman, Washington, D.C., (John H. Ferguson, Deputy Asst. Gen.

Counsel, Rosemary M. Collyer, Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for petitioner.

Henry C. Woicik, New York City, for respondent.

Before OAKES, Chief Judge, NEWMAN, Circuit Judge, and HAIGHT, District Judge.*

OAKES, Chief Judge:

This case involves the issue whether the National Labor Relations Board ("the Board") reasonably determined that Young Shi Lee was an employee within the meaning of the National Labor Relations Act ("the Act"), 29 U.S.C § 152(3). The Board is petitioning this court for enforcement of its order, dated September 13, 1988, directing the Chinatown Planning Council, Inc. ("CPC") to cease and desist from unfair labor practices and to reinstate Young, whose discharge was predicated on his concerted, protected activities.

The undisputed facts are as follows. CPC is a not-for-profit corporation, which provides a broad range of social and other services to the Chinese community in New York City. In September 1986, CPC entered into a contract with the New York City Department of Housing Preservation and Development ("HPD") for the purpose of renovating and repairing city-owned apartments that had been obtained through condemnation or foreclosure proceedings. Under the terms of the contract, HPD furnished all building materials for the renovation and repair work and compensated CPC at the rate of $90 per day per trainee. CPC provided the basic tools and the construction crews to carry out the necessary work which included painting, plastering, installing walls and ceilings, removing debris and garbage and performing general maintenance tasks. Pursuant to the contract, CPC was also obligated to provide its trainees with "on-site" training, e.g., the proper use of tools and materials, as well as "off-site" training or life skills, e.g., how to respond in job interviews and how to budget their expenditures. Finally, CPC was responsible for furnishing a variety of supportive services entailing staff who would provide personal counseling to trainees and assist the trainees in obtaining medical, legal, social and educational services.

In October 1986, CPC began its Intercity Remodeling and Apartment Repair Program ("the Program").[1] The purpose of the Program was to train newly arrived Chinese immigrants in the repair and renovation of apartments under CPC's contract with HPD. The trainees worked in crews of six: a site supervisor and a five-person crew. The site supervisor was responsible for showing the workers how to do the various construction tasks as well as overseeing the work done by the trainees. CPC paid its workers a starting salary of $5 per hour for a 35 hour work week, deducting taxes and social security payments from the weekly salaries. In addition, CPC provided disability insurance and workers' compensation.

Young Shi Lee was hired by CPC at the beginning of the Program in October 1986 at a starting salary of $5 per hour and was assigned to a site construction crew. Among the tasks he performed were ceiling repair, garbage removal and general renovations. In December 1986, Young was reassigned as a driver for CPC, which entailed driving and transferring work crews from one construction site to another as well as picking up building materials from the CPC warehouse and delivering them to the various work sites. During his tenure with CPC, Young's wages rose from a base level of $5 per hour to $7, in November 1986, and finally to $8, in January 1987.

Throughout the course of his employment, Young spoke out on behalf of him-

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

1. According to the testimony of John Wang, Deputy Director of CPC, IRAR was defined as the In Rem Apartment Repair Program although the respondent, the petitioner and the ALJ defined it as the Intercity Remodeling and Apartment Repair Program.

self and his co-workers about the poor working conditions, the lack of protective equipment for workers and the unfairness of site supervisors in meting out rewards and punishments to individuals. On three occasions in January 1987, Young made these concerns known to the then-director of the Program, Jones Chow. That same month, Young and several fellow workers attended two meetings at the home of a discharged site supervisor to discuss their concerns over working conditions. The group decided to petition Director Jones Chow for a meeting of all employees and to request the presence of an observer from the Board of Directors of CPC in order to air their grievances. Young was chosen to draft the petition and to secure the signatures of his fellow employees. By early February 1987, Young had obtained 20 signatures on the petition.

However the petition was never formally presented to either the Program's director or CPC because Director Jones Chow sent a letter to all employees, dated February 9, 1987. In his letter, Jones Chow urged the workers to be patient because the program was new. However, Jones Chow held out the prospect that the Program unit would become an "entrepreneurial constructing firm" with some of the current trainees being elevated in the future to team leaders. Although Jones Chow acknowledged that there were difficulties with the Program, including low wages, lack of equipment and lack of medical insurance, he told the workers that he could "only express [his] regrets." Jones Chow counseled the workers that patience was the "proper attitude" and implored them to "work arduously" to "create the advantageous conditions for the signing of the second contract with HPD." He also admonished the workers, stating: "I don't want to see your ways of disobedience to the work assignments."

On February 17, 1987, Young did not report to work because he had a toothache, requiring a visit to the dentist. Young attempted twice to contact his site supervisor to advise the supervisor of the reason for his absence but was apparently unable to reach him by phone. Young returned to work the following day, working a full day,

and was instructed by his supervisor to contact Director Jones Chow.

Young met with Jones Chow on February 19, 1987. In response to Jones Chow's query about Young's absence from work, Young explained that he had gone to the dentist for a toothache, showed Jones Chow a bottle of medicine and offered to furnish a doctor's note. Jones Chow then confronted Young with an accusation from an unidentified source that Young was still trying to move forward on his petition. When Young attempted to find out the identity of his accuser, Jones Chow refused to tell him. Jones Chow then told Young to stop his activities and when Young refused to acquiesce, Jones Chow not only fired him but also refused to provide a reason. However, a few days later, at Young's request Jones Chow did provide him with a letter of termination.

Several days later, Young sent a letter, dated February 23, 1987, to the Deputy Executive Director of CPC, John Wang, protesting his discharge and enclosing an unsigned copy of the petition. Upon receipt of Young's letter, Wang telephoned Jones Chow for an explanation of Young's discharge and was told that Young was terminated because he had a poor attitude, was absent on a number of occasions, and went to other work sites without permission; and also because certain site supervisors had complained about Young, asking that he be transferred.

Apparently, Wang made no further inquiries into Young's discharge until June 1987, after Young had filed charges and an inquiry on his behalf was received from the Asian–American Legal Defense Fund. Following these two events, Wang asked Jones Chow to prepare a memorandum on Young's discharge.

Following a hearing before an Administrative Law Judge ("ALJ"), the Board petitioned for enforcement of its decision and order.

## DISCUSSION

On appeal, CPC neither contests the Board's finding that Young was discharged

in retaliation for his concerted activities, 29 U.S.C. § 158(a)(1), nor denies that it was engaged in commerce within the meaning of the Act, 29 U.S.C. §§ 152(2), (6), (7). The sole issue raised by CPC is that Young was not an employee under the Act. Thus, our task is to determine whether the Board's finding that Young was an employee within the meaning of the Act is supported by substantial evidence on the record viewed as a whole. *Universal Camera v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We begin our review mindful of certain well-established principles. First, the Board enjoys wide discretion in determining an individual's or group's employee status. *N.L.R.B. v. Hearst Publications, Inc.*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), *see also Sure–Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1983). Second, "the Board's determination that specified persons are 'employees' under the Act is to be accepted if it has 'warrant in the record' and a reasonable basis in law." *Hearst*, 322 U.S. at 131, 64 S.Ct. at 860–61; *Bayside Enterprises v. N.L.R.B.*, 429 U.S. 298, 97 S.Ct. 576, 50 L.Ed.2d 494 (1977). *Accord N.L.R.B. v. Lighthouse for the Blind of Houston*, 696 F.2d 399 (5th Cir. 1983); *Cincinnati Ass'n for the Blind v. N.L.R.B.*, 672 F.2d 567 (6th Cir.), *cert. denied*, 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982); *Physicians Nat'l House Staff Ass'n v. Fanning*, 642 F.2d 492 (D.C.Cir. 1980), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981).

In this case, the Board, adopting the findings and conclusions of the ALJ, found that Young was an employee within the meaning of the Act based upon the facts governing Young's employment by CPC and the nature of the Program.[2] Young was paid a starting salary of $5 per hour for a 35–hour work week, which was more than the minimum wage. Over the course of his tenure, Young's wages rose solely at the discretion of his employer. CPC deducted taxes and social security payments from Young's salary, and provided work-

ers' compensation and disability insurance. We think that the Board was within its discretion to find that these factors established that Young was a regular employee.

Further, the ALJ found that CPC's relationship to its trainees was indicative of a commercial and business enterprise based upon the above-mentioned factors as well as others, including: the February 9, 1987 letter of Jones Chow indicating that he intended to develop the Program into an entrepreneurial construction firm within its second year of operation; the Program paralleled on-the-job training programs of trade occupations; no trainees had graduated to other employment; the primary focus of the Program was to complete the repairs and renovations; and the work as well as the terms and the conditions of employment of the trainees were identical to those of employees in the private sector.

The ALJ also concluded that the main thrust of the Program was the organization of the crews and the completion of the work; thus, the primacy of the work predominated over any other aspect of the Program. Although the ALJ took note of the Program's theoretical goal of providing its trainees with "off-site" services such as counseling, interviewing techniques and the like, the record amply demonstrates that this goal was never reached during Young's tenure. The ALJ found that Young testified credibly that he never received classes in English or other off-site skills. Indeed, the only training that he received was from site supervisors and was related to the construction tasks that he performed on the job. In addition, Wang testified that during Young's tenure with the Program, no classroom training in life skills was provided by CPC to Program workers.

Although CPC argues that the Board's decision was arbitrary because Young was a participant in a bona fide training program, which rendered the relationship between CPC and him akin to teacher and student rather than employer and employ-

---

**2.** The Board modified the remedy for computation of backpay, citing *F.W. Woolworth*, 90 N.L. R.B. 289 (1950).

ee, we cannot agree. CPC premises its argument on the Program's goal of graduating the trainees to seek other employment and providing educational and social services to its workers. However, we think that the record establishes, through the testimony of Wang and Young, that CPC had failed to fulfill the educational or social services portion of the contract. Moreover, Wang testified that the Program had not graduated any of its trainees for other employment, although some left the Program or were promoted to the position of site supervisor. Thus, the indefinite tenure of the workers, conditioned only upon the renewal of the HPD contract, indicates that the trainees were engaged in a commercial and business relationship with CPC.

Further, we note that the ALJ specifically found that the terms and conditions of employment of Young and his fellow workers were similar to those in private, commercial enterprises. The ALJ concluded that the Program training was analogous to on-the-job training in a trade occupation. The ALJ also stated that even if classroom training had been furnished to the workers, he would still have found that the trainees were "apprentices," working at a regular trade while receiving on-the-job training. *Beecher v. Ancillary Services, Inc.*, 225 N.L.R.B. 642 (1976). While we agree that the training aspect of the Program is a distinctive feature, we are not persuaded that the Board abused its discretion in determining that this factor paralleled on-the-job training in private industry.

We also find unavailing the assertion by CPC that the social and educational goals of the Program render it a rehabilitative or therapeutic program as in a sheltered workshop. The record evidence before us demonstrates the economic or business characteristics and nature of the Program. *Accord Lighthouse for the Blind of Houston*, 696 F.2d at 399; *Cincinnati Ass'n for the Blind*, 672 F.2d at 567.

Finally, CPC contends that the ALJ's reliance on *Lighthouse for the Blind of Houston*, is misplaced in light of *Arkansas Lighthouse for the Blind v. N.L.R.B.*, 851 F.2d 180 (8th Cir.1988). While we are aware that our decision today runs contrary to *Arkansas Lighthouse*, we think that *Lighthouse for the Blind of Houston* and *Cincinnati Ass'n for the Blind* more closely reflect the congressional intent and the policy underlying the Act to invest the Board with broad discretion to determine employee status within the meaning of the Act.

Petition for enforcement granted.